Miles V. WILLIAMS, Plaintiff,

v.

Lieutenant General Charles McCAUSLAND, in his official capacity as Director, Defense Logistics Agency, Defendant.

No. 89 Civ. 3924 (RWS).

United States District Court, S.D. New York.

Feb. 3, 1992.

Cravath, Swaine & Moore (Ronald S. Rolfe, of counsel), New York City, for plaintiff.

Otto G. Obermaier, U.S. Atty. S.D.N.Y. (Thomas A. Zaccaro, Asst. U.S. Atty., of counsel), New York City, for defendant.

## OPINION

SWEET, District Judge.

Plaintiff Miles V. Williams ("Williams") has alleged discrimination by defendant Lieutenant General Charles McCausland ("McCausland") in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e–16, arising out of the promotion of another employee to a position sought by Williams. Upon the trial to the Court and all prior proceedings, the facts are found and conclusions reached as set forth below in accordance with which judgment will be entered dismissing the complaint.

There is little factual dispute about what happened to Williams, a black man, in the course of his employment with the Defense Logistic Agency ("DLA") or the process by which another employee, Edward Flynn ("Flynn"), a white man, was selected for a GS–12 position as Contract Price/Cost Analyst ("CP/C Analyst"). The resolution of this action turns upon the superiority of Williams' qualifications measured against his burden of proof as it oscillates in the intricate fashion required of discrimination cases presenting the sort of fact pattern found below.

## PRIOR PROCEEDINGS

Williams filed this action *pro se* on November 8, 1990. The complaint alleged that, because of his race, Williams was denied a promotion to a GS–12 CP/C Analyst position (the "GS–12 promotion") at the Defense Contract Administration Services Residency for the Loral Electronics System Corporation ("Loral Residency"). By way of relief, Williams sought retroactive appointment to that or a comparable position, back pay, and attorneys' fees and costs.

The distinguished firm of Cravath, Swaine & Moore undertook to represent Williams *pro bono,* thus greatly assisting Williams, the Court, and the administration of civil justice in this difficult area of the law. Discovery was had, and the action was tried from December 30, 1991, to January 3, 1992. Final submissions were received on January 10, 1992.

## FINDINGS OF FACT

The DLA is an agency of the Department of Defense, responsible for providing contracting support, contract administration, and payment and logistics support for the military services. The Defense Contract Administration Services Region–New York ("DCASR–NY") was formerly a regional office of the DLA, with responsibility for providing contract support to the military services in the tri-state region. Defense Contract Administrative Management Areas ("DCASMA") were sub-offices of DCASR–NY located throughout the region. In 1990, DCASR–NY was reorganized into the Defense Contract Management Region ("DCMR").

McCausland is an officer of the United States Air Force. At all relevant times, McCausland was the head of the DLA. As such, he is sued only in his official capacity.

Williams was a GS–11 CP/C Analyst employed at DCASR–NY by the DLA since November 4, 1985. Initially, he was as-

signed to the Defense Contract Administration Services Management Area–Garden City ("DCASMA–Garden City"). In August 1988, Williams received a lateral transfer to DCASMA–NY, where he remained until December 16, 1989, when the DLA terminated his employment. The legality of that termination is currently being challenged by Williams in a separate action, styled *Williams v. McCausland*, 91 Civ. 7281, currently pending before the Court.

Lt. Commander John Giglio ("Giglio") is an officer of the United States Navy trained to perform the duties of a Supply Officer in his service. At all relevant times, Giglio was the officer in charge of the Loral Residency.

Flynn is currently a GS–12 Cost Monitor at the Loral Residency. He began his employment with the DLA in October 1986 as a GS–11 CP/C Analyst at the DCASMA–Garden City office. Flynn and Williams worked together at DCASMA–Garden City from October 1986 until May 1988. He was the successful applicant for the GS–12 promotion that Williams sought.

*The GS–12 Vacancy at the Loral Residency*

In August 1987, DLA established a residency at Loral Electronics Systems Corporation, a large defense contractor located in Yonkers, New York. The purpose of the residency was to provide DLA with a presence at Loral's facilities, enhancing DLA's ability to monitor Loral's performance of its Department of Defense contracts.

Giglio was appointed as the officer in charge of the Loral Residence. Prior to August 1987, Giglio was the officer in charge of a DLA residency at the Wedtech Corporation in Bronx, New York. That residency was closed in the summer of 1987 when Wedtech sought the protection of the Bankruptcy Court. Giglio was responsible for assembling a staff at the Loral Residency, which included one GS–11 and one GS–12 CP/C Analyst.

The two CP/C Analyst positions are largely the same, except that a GS–12 analyst is more senior and receives a higher salary than a GS–11 analyst. CP/C Analysts at both levels evaluate contract proposals by defense contractors for completeness and reasonableness and perform those functions in conjunction with a pricing team consisting of auditors, engineers, and industrial and other technical specialists. The CP/C Analyst leads the pricing team and prepares a detailed report regarding the proposed contract, including a recommended negotiating position for the Government. The CP/C Analyst's responsibilities also include conducting financial analyses of Loral's contract proposals, evaluating Loral's technical and financial ability to fully perform defense contracts, monitoring Loral's costs relating to such contracts, managing progress payments on such contracts, and performing pre-award and post-award surveillance audits of Loral's defense contracts.

In May 1988, Flynn transferred into the Loral Residency to fill the vacant GS–11 CP/C Analyst position. The GS–12 CP/C Analyst position at Loral was vacant, and Flynn performed some of the responsibilities of both the GS–11 and GS–12 CP/C Analyst positions.

*Job Opportunity Announcement No. 129–88 and the Filling of the Vacancy*

On August 11, 1988, the Office of Civilian Personnel of DCASR–NY posted Job Opportunity Announcement No. 129–88 (the "JOA"), announcing a vacancy for a GS–12 CP/C Analyst position at the Directorate of Contract Management Division of DCASR–NY. The closing date for applications was stated to be September 12, 1988.

The JOA included a listing of required qualifications, including three years of general and specialized experience relating to contract analysis and security eligibility for a noncritical sensitive position. On September 9, 1988, Williams submitted an application for the GS–12 position pursuant to the JOA and an accompanying Merit Promotion Program Supplemental Qualifications Statement ("Williams' application"). Williams' application included: (1) written answers to each of the five requirements listed in JOA; (2) Williams' two most re-

cent annual performance evaluations; (3) a transcript from the Monroe Business Institute and certificates evidencing Williams' successful completion of various governmental in-house training courses relating to CP/C Analysis; and (4) several award certificates.

The JOA identified different criteria for ranking the candidates, as well as the weight to be assigned to each factor. These criteria included: (1) the applicant's knowledge, skills and abilities in five specific areas (sixty percent); (2) performance evaluations (twenty-five percent); (3) related education, training and self-development courses (ten percent); and (4) related awards (five percent). These criteria were to be used to rank the applicants if more than five persons responded to the JOA. The position was to be awarded by the DLA on a competitive basis and to the most qualified candidate.

On September 12, 1988, the Office of Civilian Personnel amended the JOA to advertise all vacant GS–12 CP/C Analyst positions throughout the region. The location was the only change to the JOA made by the amendment.

The Office of Civilian Personnel received five applications under the JOA, including applications from Flynn and Williams. By a notice dated October 7, 1988, DCASR–NY informed Williams that he was qualified for the position under the JOA. Flynn was similarly notified. In October, the Office of Civilian Personnel forwarded the applications under the JOA to Giglio as the selecting official to enable him to fill the vacant GS–12 CP/C Analyst position at the Loral Residency. Because only five applications were submitted under the JOA, under its procedures, the Office of Civilian Personnel did not rank the applicants. Shortly thereafter, Giglio contacted each of the applicants to schedule interviews. Three applicants—Flynn, Williams and David Kameshine—agreed to be interviewed; the other two applicants declined.

Giglio separately interviewed the three applicants at the Loral Residency on October 27, 1988. During each interview, Giglio asked the applicant a predetermined set of questions he considered to be directly related to the job qualifications for the position. At Giglio's request, Charles Rawlins, a union representative from the American Federation of Government Employees, was present at and observed each interview.

After completing the interviews and reviewing the candidates' applications, Giglio concluded that Flynn was the most qualified applicant for the GS–12 CP/C Analyst position. Giglio's conclusion was based upon the qualifications, experience, and interviews of the candidates. Flynn was promoted to the position effective November 13, 1988.

*Qualifications and Experience of the Candidates*

During the time they were both employed at DCASMA–Garden City, Williams received higher performance evaluations from the same supervisor than did Flynn.

Flynn, at the time of his selection, had more than twenty years of accounting and finance-related employment experience, including twelve years in various accounting-related positions at Sinclair Oil and three years as the Cost Accounting Manager at Tensolite Co., a defense contractor. He had been employed with the United States Army Corps of Engineers for one year as a Contract Specialist, and two years as a GS–11 CP/C Analyst with the DLA. During his employment at DCASMA–Garden City, Flynn's regular responsibilities were more varied than those of Williams. Flynn was rated in six of eight categories, while Williams was rated in four of eight categories. The limited number of contract administration personnel at the Loral Residency made the ability to undertake a broader range of responsibilities an important factor.

Williams had approximately twelve years of accounting experience and specifically identified in his application three years of accounting-related experience with the DLA. He was a year senior to Flynn in DLA service. His application included a reference to "six years of combined Government and private sector experience

at working with proposals, contracts, Progress Payments and Public Vouchers."

The transcript and course certificates included in Williams' application indicated that Williams had excelled in courses at the Monroe Business Institute, including those in cost accounting and in the computer programming language COBOL, and had successfully completed government courses in: (1) Advanced Contract Administration given by the Air University, Air Force Institute of Technology; (2) DOD Cost Accounting Standards Workshop given by the U.S. Army, Logistics Management College; (3) Government Contract Law given by the Air University, Air Force Institute of Technology; (4) Quantitative Techniques for Cost and Price Analysis given by the Air University, Air Force Institute of Technology; (5) Defense Contract Administration given by the Department of the Navy, Office of Naval Acquisition Support; and (6) Introduction to Lotus 1–2–3 given by the Office of Personnel Management.

Williams also had received award certificates for (1) sustained superior performance predicated on the scores he received on his annual performance evaluations; (2) recognition of his development of a computer program designed to assist CP/C Analysts in complying with recently promulgated regulations regarding permissible profit objectives for defense contracts; and (3) not taking any sick leave during fiscal year 1987.

In making his determination, Giglio considered Flynn's experience as offsetting Williams' better evaluations at DCASMA–Garden City and his private sector and Signal Corps experience as outweighing Williams' seniority. Giglio regarded Williams' performance awards as routine and less significant than a cash grant. The computer award failed to tip the scales in Williams' favor.

*Flynn's Performance at the Loral Residency*

Flynn was the sole CP/C Analyst at the Loral Residency for approximately five months prior to his selection for the GS–12 promotion and received "highly successful" performance ratings. Giglio gave consider-

able weight to the manner in which Flynn had performed his job and in particular his satisfactory relationship with the contractors' employees. Giglio had no prior experience supervising Williams.

*Conduct of the Interview*

Flynn answered each of the questions posed by Giglio correctly and with full responses. His interview lasted about a half an hour longer than Williams' interview. As Giglio viewed it, Williams answered three questions incorrectly. At the outset of his interview, Williams perceived Giglio to be sneering. This led Williams to believe that he was being discriminated against and that Giglio was not competent to conduct the interview. Williams also sensed that Giglio's interview questions were elementary. Williams gave curt responses, considered perfunctory by Giglio, to the questions asked of him.

*Education*

Flynn is a college graduate with a degree in Marketing and Finance. Williams' college attendance was limited to fifteen credit hours at Old Dominion College in 1968, and six credit hours at St. Paul University in 1969. Giglio considered that Flynn's degree outweighed the courses taken by Williams.

*The Selection*

Giglio made his selection following the interviews. He did not call Werner Meyer, who had supervised both men at DCASMA–Garden City, nor did he check any of the references provided by either Flynn or Williams. Prior to the interviews, Giglio had had experience with Flynn and had given him "highly successful" ratings. From this it must be inferred that Giglio was predisposed towards Flynn, a predisposition that was not altered by the interviews. Giglio did not consider Williams' qualifications on paper superior to Flynn's, although their employment records at DCASMA–Garden City might compel the opposite conclusion. However, Williams' performance at the interview, for whatever reason, was inferior to that of Flynn, both as to manner and substance.

Giglio reported his decision to the Office of Civilian Personnel. The Office reviewed the record of the process and authorized Giglio to inform the candidates of his selection, which he did by telephone on November 7, 1988. Flynn was promoted to the position.

### Events Subsequent to the Selection

In January 1989, Williams was tentatively selected for the position of CP/C Analyst GS–12 at DCASMA–NY. The promotion was to be effective on January 17, 1989. In February 1989, Williams was tentatively selected for the position of CP/C Analyst GS–12 at DCASPRO–Allied Signal, and in May 1989, Williams was tentatively selected for the position of CP/C Analyst GS–12 at DCASR–NY. All of these promotions were subject to an adjudication of Williams' security eligibility.

On January 3, 1989, John Reilly ("Reilly"), the Command Security Officer of DCASR–NY, requested that Williams complete two security forms—Department of Defense Forms 398 and 2221—with respect to the use of drugs. Reilly had been advised of a security investigation initiated by the Naval Investigative Service in December 1987. Evidence had been submitted showing that marijuana had been found in Williams' coat. Williams denied that the marijuana was his and maintained that he had been the victim of a set-up. No charges were brought. Reilly also had knowledge of previous allegations against Williams in 1987 relating to security eligibility. The allegations had been withdrawn.

Upon learning that the DLA intended to revoke his security eligibility, Williams challenged the validity of the proposed revocation in a federal lawsuit filed January 20, 1989, which was dismissed on May 31, 1990. *Williams v. Reilly*, 743 F.Supp. 168 (S.D.N.Y.1990).

On March 1, 1989, the DLA advised Williams that if he did not complete the security forms he would not be eligible to occupy a sensitive position within the DLA. The DLA's decision to revoke Williams' security eligibility on the basis of his refusal to complete Forms 398 and 2221 became

effective on June 21, 1989. Williams was discharged from the DLA on December 16, 1989, for discourteous and disrespectful conduct.

### Williams' Discrimination Complaint

The same day he was notified that he had not been selected for the GS–12 promotion at the Loral Residency, Williams filed a preliminary complaint of race discrimination with Lawrence Boothe ("Boothe"), the Director of the Equal Employment Opportunity Office of DCASR–NY. The complaint alleged that Williams was more qualified than Flynn for the GS–12 promotion and, therefore, his non-selection must have been motivated by racial animus. After receiving the complaint, Boothe assigned Diane Wills ("Wills"), an EEO counselor, to attempt to resolve the complaint informally.

Williams received no counselling on his claim although counselling is required by internal DLA and EEO guidelines. Efforts by EEO personnel with DLA management to resolve Williams' grievances were not successful. According to EEO records, "[t]here were several periods of delay including: Counselor not sending required letter in timely manner. Counselor not completing required report in timely manner. Supervisor and Commander delaying response to resolution attempts."

On December 6, 1988, twenty-one days after filing his preliminary complaint and the first day on which he legally could have done so, Williams filed a formal complaint of discrimination. Unlike the preliminary complaint, the formal complaint contained numerous allegations of discrimination against a variety of DLA employees dating as far back as 1987. Williams' filing of a formal complaint automatically terminated all efforts to resolve the complaint informally.

In January 1989, the DLA acknowledged receipt of Williams' formal discrimination complaint. In March, the DLA advised Williams that an EEO investigator had been assigned to conduct an investigation of Williams' allegations. The DLA also advised Williams that, pursuant to EEO

regulations, they would only investigate the alleged discriminatory acts that occurred within thirty days of the filing of the preliminary complaint.

William Jefferson, the EEO investigator assigned to investigate Williams' complaint, attempted to meet with Williams on April 17, 1989 to discuss the allegations. Dissatisfied with the DLA's notification that it would only investigate Williams' GS–12 promotion claim, Williams refused to meet with Jefferson or otherwise cooperate with the investigation.

On June 6, 1989, 180 days after filing his formal discrimination complaint, and on the first day that he was legally entitled to do so, Williams filed this action. The filing of this action automatically terminated the EEO investigation.

CONCLUSIONS OF LAW

*Williams Established a Prima Facie Case of Racial Discrimination*

■ The Supreme Court's test for proving a *prima facie* case of race discrimination, established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), applies to failure to promote cases. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 185–88, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989). Establishment of a *prima facie* case "creates a presumption that the employer unlawfully discriminated against the employee." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

Williams met the four prongs of the *McDonnell Douglas* test: (1) he is black; (2) he applied for a position for which the DLA was seeking applicants; (3) he was qualified for the position; and (4) Flynn, who is white, was promoted rather than Williams. A rebuttable presumption of discrimination by the DLA against Williams was established.

*The Reasons for the Selection Were Not Pretextual*

■ Once a plaintiff establishes a *prima facie* case, "the burden shifts to the defendant 'to articulate some legitimate nondis-

criminatory reason for the employee's rejection.'" *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093 (quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824). The plaintiff then has an opportunity to prove that the "reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.*, 450 U.S. at 253, 101 S.Ct. at 1093. Plaintiff may carry its burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095.

■ Giglio selected Flynn based on Flynn's experience, education, performance at the Loral Residency, and the results of the interview. The decision is worthy of credence and not pretextual.

■ The burden returned to Williams, but he failed to submit evidence that the failure of Giglio to promote him was based on race. Although blacks were alleged to be under-represented in professional contract administration positions in DCASR–NY, as the Supreme Court recently stated, racial imbalances in a segment of an employer's work force do not prove discrimination:

> The Court of Appeals' theory, at the very least, would mean that any employer who had a segment of his work force that was—for some reason—racially imbalanced, could be haled into court and forced to engage in the expensive and time-consuming task of defending the "business necessity" of the methods used to select the other members of his work force. The only practicable option for many employers will be to adopt racial quotas, insuring that no portion of his work force deviated in racial composition from the other portions thereof; this is a result that Congress expressly rejected in drafting Title VII.

*Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 652, 109 S.Ct. 2115, 2122, 104 L.Ed.2d 733 (1989).

To the extent such evidence is relevant, "[t]he 'proper comparison [is] between the racial composition of [the at-issue jobs] and

the racial composition of the qualified ... population in the relevant labor market.' " *Id.* at 650, 109 S.Ct. at 2121 (quoting *Hazelwood School District v. United States*, 433 U.S. 299, 308, 97 S.Ct. 2736, 2742, 53 L.Ed.2d 768 (1977)). No evidence was presented at trial establishing a disparity between the percentage of blacks in professional contract administration positions within DCASR–NY and the percentage of blacks in the relevant labor pool.

■ The irregularities in the EEO process do not give rise to an inference of discrimination in Giglio's selection either. There can be no dispute that any purported deficiencies in the processing of Williams' EEO complaint occurred after the selection. Williams' EEO experience does not establish that the DLA was engaged in a "pattern and practice of discrimination" against blacks.

> The establishment of a pattern or practice of discrimination requires proof of "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts" and depends upon a finding by "a preponderance of the evidence that racial discrimination was the [defendant's] standard operating procedure—the regular rather than the unusual practice."

*E.E.O.C. v. Federal Reserve Bank of Richmond*, 698 F.2d 633, 642 (4th Cir.1983) (quoting *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977)), *rev'd on other grounds sub nom. Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984); *see also Bridgeport Guardians, Inc. v. City of Bridgeport*, 933 F.2d 1140, 1148 (2d Cir.), *cert. denied*, — U.S. ——, 112 S.Ct. 337, 116 L.Ed.2d 277 (1991).

Williams also failed to establish that the merit promotion regulations were violated in connection with the JOA and its amendment. Such procedures are "mediate" actions which are not subject to Title VII scrutiny:

> [T]here are many interlocutory or mediate decisions having no immediate effect upon employment conditions which were not intended to fall within the direct proscriptions of ... Title VII. We hold here merely that among the latter are mediate decisions such as those concerning composition of the review committees in the instant case that are simply steps in a process for making such obvious end-decisions as those to hire, to promote, etc.

*Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.1981), *cert. denied*, 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981); *see also Young v. Lehman*, 748 F.2d 194, 198 (4th Cir.1984), *cert. denied*, 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 489 (1985).

## CONCLUSION

Because Giglio's reasons for selecting Flynn were not pretextual and because Williams has failed to establish that the promotion was denied to him because of his race, the complaint will be dismissed. Submit judgment on notice.

It is so ordered.