John **BRIERLY**, Plaintiff,

v.

**DEER PARK UNION FREE SCHOOL DISTRICT, Donald R. Bright, School Superintendent, in his individual and professional capacity, Richard Banyon, Assistant Superintendent, in his individual and professional capacity, Owen Spanier, Principal, in his individual and professional capacity, Rena Bologna, Assistant Principal and Assistant Superintendent, in her individual and professional capacity, Michael Canipe, Director of Fine and Performing Arts, in his individual and professional capacity, and Jeff Dailey, Director of Fine and Performing Arts, in his individual and professional capacity, Defendants.**

No. 02–CV–2558 (DRH)(WDW).

United States District Court,
E.D. New York.

March 23, 2005.

Cronin & Byczek, LLP by Susan Penny Bernstein, Lake Success, NY, for Plaintiff.

Miranda & Sokoloff, LLP by Michael Anthony Miranda, Mineola, NY, for Defendants.

## *MEMORANDUM & ORDER*

HURLEY, District Judge.

### *INTRODUCTION*

John Brierly brought the present employment discrimination suit against his former employer, the Deer Park Union Free School District, and several of his former supervisors. He alleges age and gender discrimination, as well as retaliation, pursuant to a group of federal statutes; he also alleges a variety of state law claims. The defendants have moved for summary judgment on all of Brierly's federal claims. For the reasons that follow, their motion is GRANTED, supplemental jurisdiction over Brierly's state law claims is declined, and this entire case is therefore DISMISSED.

### *BACKGROUND*

The following facts are undisputed by the parties or are apparent from their documentary submissions, unless otherwise indicated:

The Deer Park Union Free School District ("the District") is located in Suffolk County, and administers five schools, including the Deer Park High School ("the High School") and the John F. Kennedy Intermediate School ("the Intermediate School"). John Brierly is a white male, was approximately fifty years old at the filing of this complaint in April 2002, and holds a Master's Degree in Education from Adelphi University, and a Master's Degree in School District Administration from Long Island University. He was employed by the District as a music teacher from September 1984 until he resigned in June 2001; during the period relevant to this case, he also served as "co-curricular director" of the Deer Park High School Marching Band.

Michael Canipe was employed with the District for roughly thirty years, and was Brierly's immediate supervisor throughout nearly all of the period at issue in this case, first as the District's "Director of Music" and then as "Director of Fine and Performing Arts." Upon Canipe's retirement in January 2001, Dr. Jeff Dailey was hired to replace him, and thus was Brierly's immediate supervisor during the final months of his employment. At all times relevant to this case, Donald Bright was the District's Superintendent of Schools, Richard Banyon was Assistant Superintendent, Rena Bologna was an Assistant Principal at the High School and Assistant Superintendent, and Owen Spanier was the Principal of the High School.

Brierly was, at least by his own account, a devoted band leader, "expend[ing] numerous personal hours and funds" in directing the marching band. From 1999–2001, he directed the marching band "as a fully competitive marching organization and put forth great personal expense and

time so that the students of Deer Park could compete on as equal a footing as possible with adequately funded organizations." It is undisputed that under his direction, Deer Park school bands "earned a statewide reputation for excellence," garnered high ratings at music festivals, and played at "diverse venues" such as the Miss America Pageant, Disneyworld, and the New York City St. Patrick's Day Parade. Throughout his time at Deer Park High, Brierly received numerous letters from parents and his supervisors commending him on the excellence of the school's bands and performing groups.

Despite Brierly's successes as a band leader, he received some negative critiques as a music teacher from Canipe, which apparently led to, or furthered, the development of a contentious relationship between the two of them. A 1986 "Teacher Observation" by Canipe noted "3 areas of concern" with Brierly's teaching methods and techniques. A 1989 "Teacher Observation" by Canipe instructed Brierly to "become totally involved in the fundamentals of music education," and recommended that he spend "two or three days" observing band lessons at a neighboring high school. A 1991 Teacher Observation by Canipe expressed four areas of concern regarding Brierly's teaching methods, and warned that "I am not sure you have the patience, organizational skills, the background, and the willingness to learn to develop into a fine educator." Brierly refused to sign the bottom of this report, and instead submitted a letter responding to Canipe's specific criticisms and detailing his qualifications and past successes. Brierly's letter accused Canipe of "intentionally misrepresenting and misinterpreting what he witnessed," and "question[ing] my competence and impugn[ing] my reputation as a teacher and as a musician." The letter also noted that "the stress caused me by this situation" was "seriously affect-

ing my health," and "places my reputation, my career and the well-being of my family in jeopardy." Brierly's note concluded by warning: "If a satisfactory resolution to the problems caused by these actions ... cannot be found, then I will be forced, in the near future, to consider all my possible, including legal, recourses."

Canipe's less-than-glowing critiques of Brierly's teaching continued, however, and in September 1994 Brierly filed a grievance against Canipe for the latter's negative annual evaluation of Brierly's performance during the 1993–1994 academic year. Brierly's grievance asserted that Canipe had "ulterior motives for discrediting Brierly's knowledge," including "professional jealousy," "personal animosity," and their "strained relationship"; and Brierly demanded that the evaluation be stricken from his personnel file. The arbitrator later denied Brierly's requested relief, holding that the annual evaluation was, as required, "based upon individual ones rendered during the school year." The arbitrator also found, without taking any position on whether the underlying individual evaluations were correct, no indication in the record that they were based on bad faith.

From about 1995 onward, Brierly's time at the District was marked by a variety of events that indicate a steadily-worsening relationship with his supervisors. On February 9, 1995, Brierly informed Canipe that he was cancelling the High School Jazz Ensemble's trip to a festival in Boston that had been planned for March 3–5 of that year, in light of other conflicting student activities. In response, Canipe sent Brierly a memorandum stating: "You guaranteed that the Jazz Ensemble's trip to Boston would not be cancelled," and noting that "in the future I will not approve any field trip request that you submit for any organization that has conflicts

with or has an impact on student participation in functions already scheduled."

In a March 8, 1995 memorandum, Canipe lambasted Brierly's "unsatisfactory" preparation for the High School Band's participation in the New York City St. Patrick's Day Parade. Specifically, Canipe noted, "you proceeded in this matter by passing over me at the outset, getting students and parents involved prior to receiving approval from me to proceed, [and] bringing paperwork to me only at the last possible moment." Canipe also stated that Brierly's "approach and subsequent actions are totally unacceptable and contrary to standard district procedures and not in compliance with [a prior] directive." Canipe reminded Brierly "of direction received in 1987 to work through the chain of command," and noted Brierly's "blatant disregard of my administrative responsibilities and your disregard of previous official communication given to you specifically directing you not to conduct matters in this fashion."

On October 1, 1996 Canipe sent a memorandum commending Brierly on the recent "outstanding presentation" by the High School's Marching Band and Color Guard in the Miss America pageant, acknowledging "how much time, effort and hard work is needed to prepare for such an event," but expressing "a few concerns regarding certain procedures which we must address and correct for all future events." Specifically, Canipe told Brierly that "[w]hen I approved this project it was with the understanding that preparations and rehearsals would take place before or after regular school hours," but that in the days leading up to the event Brierly had

ended up "involved from 6:00 A.M. until probably 9:00 P.M. preparing, organizing and rehearsing," and "did not fulfill your contractual and educational responsibilities," specifically "teach[ing] your rotating lessons." Canipe also noted that Brierly had failed to provide the Attendance Office with a complete list of participating students, and contrary to a prior directive, had improperly allowed the participation of a student who had been arrested for shoplifting during a prior band trip.

According to a September 1997 memorandum from Assistant Superintendent Banyon, he, Brierly, and Principal Spanier met that month to discuss "the prior relationship between you and Mr. Canipe," and "the problems which existed regarding the organization and planning of summer band camp." According to Banyon's memorandum, "the meeting concluded with the understanding that Mr. Canipe is your immediate supervisor." "We trust," Banyon stated, "that there will exist a mutual cooperation and a better working relationship. As Mr. Spanier and I explained, should problems continue to arise, we will explore other avenues, in order to maintain the music program."

According to Brierly, at some point in December 1998, he informed Banyon that he intended to "support" and participate as a witness in fellow teacher Eileen Cullinane's impending employment discrimination suit.[1] Further, says Brierly, he "openly expressed criticisms of defendants' discriminatory actions" later that month.

Brierly subsequently applied for an open position as the District's "Music Coordinator" in the spring of 1999,[2] but was passed

---

1. Cullinane subsequently (in 2000) filed federal discrimination claims against Banyon, Spanier, Canipe, and the District under Title VII and IX, and the ADEA. The case later settled.

2. The Defendants insist that this in fact occurred "in or about October 1999." Because Brierly is opposing the Defendants' summary judgment motion and all inferences must therefore be drawn in his favor, this opinion

over in favor of one Sara Watkin–Fox, whom he describes as "a female probationary teacher with less than two years experience in the school, approximately thirty years of age, who did not have any of the professional qualifications, experience or credentials possessed by plaintiff." Fox resigned after one year in the position when her husband became ill, and Brierly, the only applicant for the position, was then appointed in her place.

In the spring of 2000, according to Brierly's memorandum and Rule 56.1 statement, he met with Banyon and complained about "age and gender discrimination." Brierly also claims to have reiterated his "involvement in the Cullinane case," including the "documentary evidence he was supplying in support of Cullinane." And Brierly came forward with allegations that Canipe had once improperly ordered a gold trombone mouthpiece for himself using school funds, and that Canipe had improperly performed in for-profit music events during school hours. According to Brierly's deposition testimony in the Cullinane case, he had confronted Canipe about the mouthpiece purchase in 1997, hoping that veiled threats to disclose the issue to the administration would force Canipe to "lay off" him; in the same deposition testimony Brierly suggests that in subsequently approaching Banyon with these accusations, he was attempting to engineer Canipe's removal and his own elevation to the arts director position. Banyon investigated the allegations, but stated that he was unable to substantiate them.

In February or March 2000, Spanier, Canipe, and Brierly met in Spanier's office and discussed Brierly's allegations regarding Canipe. At this "meeting," according to Brierly's deposition testimony in this

case, he called Canipe "a bastard and a crook." Brierly has not disputed the Defendants' contention that he also yelled, and "tried to prevent Mr. Canipe from leaving the office." At a subsequent meeting on April 10, 2000, Brierly met with Banyon, Spanier, and Canipe regarding the previous incident. Banyon sent Brierly a memorandum later the same day to summarize the meeting, which stated: "At this meeting of April 10, 2000, you were told that such unprofessional behavior will not be tolerated. Therefore, please be advised that should an incident like this reoccur, I will have no other alternative than to explore other options to improve upon your professional demeanor in Deer Park." Brierly later testified, at his deposition in the Cullinane case, that upon conclusion of the April 10 meeting he had "walked out of the room" thinking: "I just sat down with the assistant superintendent of schools and the principal and I got away for free [for] telling off my boss."

In the fall of 2000, Canipe announced his retirement, and Brierly applied for his position. Defendant Jeff Dailey was chosen instead. According to Brierly, "although Plaintiff was the more qualified candidate, the Defendants selected a younger male for the position [who] did not have the experience and skill of the Plaintiff and came from another district." Brierly subsequently wrote a letter to Bologna (with copies to Bright and Spanier), acknowledging that he had not been chosen to replace Canipe, and promising "that whatever your final decision, I will continue to fulfill my responsibilities as professionally as possible, and to provide the students I am fortunate to teach with the best possible educational opportunities." However, Brierly noted his "serious concerns regarding several aspects of your entire se-

assumes that Brierly's recounting is correct. *See* Discussion, Part I.A, *infra*. This assump-

tion does not affect the determination of the motion. *See* Discussion, Part II.D, *infra*.

lection process," and strongly hinted that the administration should reconsider its decision. He also proposed restructuring the school band program, suggesting that running it was a seven-day-a-week job for which he was inadequately "encouraged and rewarded." Brierly suggested that the absence of any reward for his "professional growth and accomplishment" would "result in teaching professionals resigning themselves to becoming 7am–2pm employees."

On February 26, 2001, Brierly sent a memorandum to Dailey, stating that "I do not intend to direct next year's Marching [Band] as a competing organization. This will enable you, should you so choose, to explore, in a timely fashion, obtaining leadership to continue the existing program." Brierly's decision was apparently based on his conclusion that "the stipend for Marching Band Director ... includes only the [few local] performances listed above; additional compensation ... never increased as the program evolved into much more demanding, co-curricular, competitive activity." Brierly also stated that "[i]n the event that no one steps forward to direct the program as a competitive group, I am willing to remain as the director of the marching band in the capacity that I served before the program became an exclusively co-curricular, competitive activity."

At some point after Brierly sent this memorandum, he asserts, the Defendants "intentionally preclud[ed]" the marching band from participating in the 2001 New York City St. Patrick's Day Parade," to which it had been invited for a fifth consecutive year, by "deliberately schedul[ing] a high school musical on that same day."

The Defendants claimed (and still claim) that Brierly's February 2001 letter was effectively a notice that he was resigning as band director, and upon receiving it, they announced the position as vacant. However, Brierly asserts that his letter was merely a suggestion that the marching band program be reorganized, and on April 6, 2001 Brierly sent an additional memo to Dailey and Spanier, with particular proposals for the program, including rescheduling classes to facilitate student participation, and increasing funding and director compensation. In a third memorandum, dated April 17, 2001, Brierly informed Spanier "of my interest in retaining my position as Marching Band Director. I am willing to undertake the responsibilities of a non-competitive marching band and to participate in the non-competitive marching band activities as described in my memo of February 26, 2001." Brierly added: "I would also like to continue as director of the Jazz Ensemble for the 2001–02 school year." According to the complaint, on or about April 21, 2001 the Defendants rejected Brierly's proposals for the band, "fail[ed] to inform him that he would not be rehired for the position," and decided to replace him as marching band director "with a significantly younger male" who had "less than two years of teaching experience."

On April 30 or May 1, 2001, Spanier sent a memorandum to Brierly warning that he had accumulated nine absences, and that "any teacher having 10–13 days absent will receive "R" (requires improvement), and that any teacher having 14 or more days absent will receive "U" (unsatisfactory) on item 9a of the annual teacher report." The Defendants have presented evidence indicating, and Brierly does not dispute, that such memoranda were issued any time a teacher was one absence away from receiving a "requires improvement" or equivalent mark in his or her annual evaluation; Brierly had received such warnings in 1990, 1992, 1994, 1995, and 1999. How-

ever on this occasion, the warning was followed by a May 9, 2001 memorandum from Bologna to Brierly stating: "As a consequence of our conversation this morning, I find it necessary to stress the importance of consistent teacher attendance in order to facilitate on-going student growth. I trust you will make a more concerted effort to improve your attendance." According to Bologna's deposition testimony, this was "typical of what I did with other teachers." But Brierly insists that "[t]his type of warning from such a high level administrator was never done before." [3]

On June 22, 2001, the last day of school, Dailey informed Brierly that he was being transferred to the Intermediate School to teach music for the following academic year. According to Brierly, this transfer would have "precluded [his] involvement in the performing musical groups," for which he had received an extra stipend. Brierly filed an employment discrimination charge against the Defendants with the U.S. Equal Employment Opportunity Commission (EEOC) on July 27, 2001, and apparently received a right to sue letter.[4] On August 23, 2001 Brierly sent Bologna a resignation note, to be effective immediately; on August 29, 2001, Bologna informed Brierly that the Board of Education had approved his resignation.

On July 8, 2002, Brierly commenced the present civil action. His complaint alleges gender discrimination, retaliation, and a hostile work environment in violation of Title VII and Title IX of the Civil Rights Act of 1964; age discrimination, retaliation, and a hostile work environment in violation of the Age Discrimination in Employment Act (ADEA); and deprivation of federal and state constitutional rights, particularly due process and equal protection, pursuant to 42 U.S.C. § 1983; the complaint also asserts various state law causes of action.

Brierly's complaint makes the following specific allegations: (1) that the Defendants retaliated against Brierly after he supported Cullinane in her lawsuit and "openly expressed his criticism of defendants' discriminatory actions," by refusing to select him for the Music Coordinator position in the spring of 1999; (2) that more generally, the Defendants discriminated against Brierly "by intentionally exhibiting preferential treatment toward females under the age of 40" when they chose Sara Watkin–Fox to be the Music Coordinator; (3) that after Brierly complained of "discrimination and retaliation" in the spring of 2000, the Defendants "continu[ed] to engage in discriminatory and retaliatory conduct against the Plaintiff"; (4) that in particular, the Defendants "intentionally retaliated against the Plaintiff for his engagement in protected activity by refusing to select him" to be District Art Director in the fall of 2000; (5) that, more generally, the Defendants discriminated against Brierly "by intentionally exhibiting

---

3. Determining whether this type of warning was standard or unprecedented is unnecessary for resolving the present motion. *See* Part II.D.3, *infra.*

4. Brierly's complaint states that "[a] copy of the 'Right to Sue' letter issued to Murphy, along with his charge of discrimination is annexed hereto and made a part hereof as Exhibit A." It is not clear who Murphy is, or why his "Right to Sue" letter is relevant. And while Brierly's complaint includes a copy

of his combined New York State Division of Human Rights and EEOC charge, it does not contain a copy of any "Right to Sue" letter. Nevertheless, the Defendants do not raise any argument as to the procedural adequacy of Brierly's complaint, and it is presumed that Brierly properly exhausted his administrative remedies as required under the law. *See Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 82–83 (2d Cir.2001).

preferential treatment toward younger males" when they chose Dailey to be the District Art Director, and that this is part of "a long history of discriminating against older teachers"; (6) that the Defendants "retaliated against the Plaintiff by rejecting [his] proposals for the Marching Band co-curricular activity and by failing to inform him that he would not be rehired for the position; " (7) that the Defendants "intentionally discriminated against the Plaintiff by failing to even inform him that he would not be rehired and by replacing him ... with a significantly younger male with less than two years of teaching experience"; (8) that the Defendants "retaliated against [Brierly] by falsely claiming he was 'close to an attendance concern' "; and (9) that the Defendants "retaliated" against Brierly by transferring him to the Intermediate School. Brierly seeks a declaratory judgment that the Defendants' actions were unconstitutional and unlawful, as well as "two million ($5,000,000.00) [sic] dollars in compensatory damages," and one million dollars in punitive damages.

On March 8, 2004, the Defendants filed the present motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.

## DISCUSSION

### I. *Applicable Law and Legal Standards*

#### A. *Summary Judgment*

■ Summary judgment is generally appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir.1994) (quoting Fed.R.Civ.P. 56(c)). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir.1996) (citing Fed. R.Civ.P. 56(c)).

■ To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990) (quoting *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir.1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir.1996) (internal citations omitted).

■ The district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir.1997) (citing

*Anderson,* 477 U.S. at 252, 106 S.Ct. 2505), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester,* 863 F.2d 205, 211 (2d Cir.1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210–11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.'" *Brady,* 863 F.2d at 211 (citing *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348).

 Summary judgment is generally inappropriate where questions of the defendant's state of mind are at issue, *Gelb v. Bd. of Elections of the City of New York,* 224 F.3d 149, 157 (2d. Cir.2000), and should thus be granted with caution in employment discrimination cases. *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994); *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 134 (2d Cir.2000). Nonetheless, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 40 (2d Cir.1994). "The summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). "[T]he salutary purposes of summary judgment— avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Id.* "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo,* 22 F.3d at 1224.

### B. *Federal discrimination laws*

 Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17, makes it "an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Title VII also makes it unlawful for an employer to discriminate against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter," 42 U.S.C. § 2000e–3(a), and is violated when a retaliatory motive "plays a part in adverse employment actions toward an employee, whether or not it was the sole cause." *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir.1993).

Title IX of the Education Amendment of 1972 provides in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Defendants do not dispute Brierly's statement that the District is a recipient of federal education funding.

The Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–34, applies to people who are between the ages of

forty and seventy. 29 U.S.C. § 631(a). It provides in relevant part: "It shall be unlawful to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). It also provides in pertinent part that: "[i]t shall be unlawful for an employer to discriminate against any of his employees or applicants for employment ... because such individual ... has opposed any practice made unlawful by this section, or ... has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d).

Title 42 U.S.C. § 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...

That is, Section 1983 "furnishes a cause of action for the violation of federal rights created by the Constitution." *Annis v. County of Westchester, N.Y.*, 36 F.3d 251, 254 (2d Cir.1994) (citing *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979)).[5]

### C. *The McDonnell Douglas burden-shifting methodology*

In *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court first enunciated the now-familiar "burden-shifting" formula used in analyzing Title VII employment discrimination claims based on indirect or circumstantial evidence. This standard was further refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The same formula is also applied to disparate treatment and retaliation employment discrimination claims brought pursuant to Title IX, *see AB ex rel. CD v. Rhinebeck Cent. Sch. Dist.*, 224 F.R.D. 144, 153 (S.D.N.Y. 2004) (citing *Murray v. New York Univ. Coll. of Dentistry*, 57 F.3d 243, 248 (2d Cir.1995)), the ADEA, *see Schnabel v.*

---

**5.** While Title VII does not preempt or exclude employment discrimination claims from being brought under § 1983 as well, *see Carrero v. New York City Housing Auth.*, 890 F.2d 569, 576 (2d Cir.1989) (citing *Vulcan Soc'y of the New York City Fire Dep't, Inc. v. Civil Serv. Comm'n*, 490 F.2d 387, 390 n. 1 (2d Cir. 1973)), the Court of Appeals for the Second Circuit has yet to determine whether the ADEA is the exclusive federal remedy for age discrimination, and thus preempts age discrimination claims brought pursuant to Section 1983; and the district courts in this circuit are split on the issue. *See Buckley v. City of Syracuse*, 28 F.Supp.2d 87, 89 n. 4 (N.D.N.Y.1998) (comparing cases). Similar-

ly, the Second Circuit has yet to determine whether an employee of a federally-funded education program can maintain a private right of action under Title IX against his employer based on sex-based employment discrimination; again, the district courts within this circuit are split on the issue. *See Gardner v. St. Bonaventure Univ.*, 171 F.Supp.2d 118, 127 (W.D.N.Y.2001) (comparing cases). It will be assumed, for purposes of this decision, that an employee may in fact sue his former employer for age discrimination under both the ADEA and Section 1983 concurrently, and that he may bring a private cause of action against a federally-funded educational institution that employed him pursuant to Title IX.

*Abramson,* 232 F.3d 83, 87 (2d Cir.2000), and Section 1983. *See Sorlucco v. New York City Police Dep't,* 888 F.2d 4, 7 (2d Cir.1989), *and Domenech v. City of New York,* 919 F.Supp. 702, 706 (S.D.N.Y. 1996).

Under *McDonnell Douglas* and its innumerable progeny, (1) a plaintiff must first establish a prima facie case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell Douglas* framework and its presumptions and burdens disappears, leaving the sole remaining issue of "discrimination vel non," and thus (3) the burden shifts back to the plaintiff to prove that the employer's stated reason is merely pretextual and that age or gender discrimination was an actual reason for the adverse employment action. See Reeves v. *Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

The burden of establishing a prima facie case of employment discrimination has been described as "modest," *Viola v. Philips Med. Sys. of N. Am.,* 42 F.3d 712, 716 (2d Cir.1994), or even "minimal." *Roge v. NYP Holdings, Inc.,* 257 F.3d 164, 168 (2d Cir.2001). It is a burden of production, not persuasion, and involves no credibility assessments. *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097.

Likewise, the employer's burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle. It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory. *See Seils v. Rochester City Sch. Dist.,* 192 F.Supp.2d 100, 111 (W.D.N.Y.2002) (citing, *inter alia, Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.1985)). Federal courts do not have a "roving commission to review business judgments," *Mont. v. First Fed. Sav. & Loan Ass'n of Rochester,* 869 F.2d 100, 106 (2d Cir.1989) (quoting *Graefenhain v. Pabst Brewing Co.,* 827 F.2d 13, 21 n. 8 (7th Cir.1987)), and may not "sit as super personnel departments, assessing the merits—or even the rationality—of employers' non-discriminatory business decisions." *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 825 (1st Cir.1991). Thus, "[e]vidence that an employer made a poor business judgment generally is insufficient to establish a question of fact as to the credibility of the employer's reasons." *Dister v. Cont'l Group, Inc.,* 859 F.2d 1108, 1116 (2d Cir. 1988).

In order to demonstrate that the employer's stated non-discriminatory reasons for the allegedly discriminatory action are pretextual, "[a] plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir. 1995). A discrimination claimant may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Bombero v. Warner–Lambert Co.,* 142 F.Supp.2d 196, 203 n. 7 (D.Conn.2000) (quoting *Anderson v. Coors*

*Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir.1999), and citing *Olson v. Gen. Elec. Astrospace,* 101 F.3d 947, 951–52 (3d Cir. 1996)).

■ However, to rebut an employer's proffered non-discriminatory rationale for its actions and withstand summary judgment, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight." *Smith v. Am. Exp. Co.,* 853 F.2d 151, 154–55 (2d Cir.1988). "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985).

II. *Brierly's Title VII, Title IX, ADEA, and Section 1983 Claims Are All Inadequate to Withstand the Defendants' Summary Judgment Motion.*

A. *Brierly has failed to show that any of the Defendants engaged in a discriminatory pattern or practice.*

Although it is not listed as one of his causes of action, Brierly's complaint states that the Defendants "have a long history of discriminating against older teachers by selecting untenured and/or less experienced teachers 40 years old or younger for administrative and other selective positions, intentionally bypassing more qualified candidates." Brierly seems to be asserting this claim against all of the Defendants. In an abundance of caution, the Court will interpret this as claiming a discriminatory policy or practice under the ADEA.

To support his allegations of the Defendants' "long history" of purported age discrimination, Brierly offers only three specific examples beyond Sara Watkin–Fox and Dr. Dailey (who are discussed *infra* ):

"Todd Wallace, late 20s, was made Assistant Principal in July 2001 and Nan Klosk, also in her 20s was made Assistant Principal in September 2000 and approximately two years later made principal, Robert Reahle, twenty eight was promoted to art coordinator."

■ Establishing a discriminatory "pattern" or "practice" requires proving by a preponderance of the evidence that the discrimination in question reflects the defendant's "standard operating procedure"; this requires a demonstration of more than merely some "isolated" or "sporadic" events. *Williams v. McCausland,* 782 F.Supp. 272, 279 (S.D.N.Y.1992) (citations omitted). The fact that on several occasions Brierly or some other teacher over forty years in age was passed over for a position cannot suffice to establish a discriminatory policy or practice on the Defendants' part. *See Ste. Marie v. Eastern R. Ass'n,* 650 F.2d 395, 405 (2d Cir.1981) (holding seven individual incidents of discrimination insufficient to establish pattern or practice). Because Brierly has offered no evidence that directly establishes a policy or practice, and insufficient evidence to circumstantially suggest one, he has failed to state any cognizable claim on this ground.

B. *Brierly has failed to show a hostile work environment.*

As noted, Brierly's complaint alleges that he was subjected to a hostile work environment, which the defendants both "intentionally created," and failed to remedy, in violation of both Title VII and the ADEA.

■ "The analysis of the hostile working environment theory of discrimination is the same under the ADEA as it is under Title VII." *Brennan v. Metro. Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir. 1999). Under both statutes, an actionable

hostile work environment means a workplace "permeated with discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir.2003) (internal quotations and citations omitted). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

 "Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Thus, discriminatory acts or incidents must generally be more than "episodic" to create a hostile work environment; [6] they must be "sufficiently continuous and concerted in order to be deemed pervasive." *Carrero v. New York City Housing Auth.*, 890 F.2d 569, 577 (2d Cir.1989). "Isolated, minor acts or occasional episodes do not warrant relief." *Brennan*, 192 F.3d at 318. The U.S. District Court for the District of Columbia has explained that "[d]iscrete acts constituting

discrimination or retaliation claims" must be kept conceptually distinct from hostile work environment claims, which "must be based on severe and pervasive discriminatory intimidation or insult." *Lester v. Natsios*, 290 F.Supp.2d 11, 32–33 (D.D.C. 2003) (citing *Nat'l R.R. Passenger Corp.*, 536 U.S. at 115–16, 122 S.Ct. 2061; *Gardner v. Tripp County, S.D.*, 66 F.Supp.2d 1094, 1100–01 (D.S.D.1998); and *Parker v. State, Dep't of Pub. Safety*, 11 F.Supp.2d 467, 475 (D.Del.1998) (warning of "the dangers of allowing standard disparate treatment claims to be converted into a contemporaneous hostile work environment claim.")).

 Brierly's memorandum correctly recites the definition of a hostile work environment, and Brierly's complaint states that the Defendants' conduct "adversely affected the terms and conditions of his employment," and caused him "pain, humiliation, [and] extreme emotional distress." However, Brierly's submissions fail to allege anything other than *discrete acts* of purported discriminatory treatment by the Defendants, including cancelling the High School Band's participation in the 2001 St. Patrick's Day Parade, "claiming falsely that [Brierly] resigned" upon receipt of his February, 2001 letter, and demoting Brierly to teaching at the Intermediate School.

---

**6.** In some instances, a single act *can* create a hostile work environment—"if, by itself, it can and does work a transformation of the plaintiff's workplace." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir.2002). Such single acts must be "extraordinarily severe." *Id.* (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000)). *Compare Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir.2000) (single instance of obscene comments by co-worker sufficed to create hostile work environment under Title VII where comments were loud, prolonged, made in front of "a large group in which [the plaintiff] was the only female and many of the men were her subordinates," and "included charges that [the

plaintiff] had gained her office of lieutenant only by performing fellatio."); *with Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir.1998) (supervisor's comment to plaintiff on one occasion that "she had been voted the 'sleekest ass' in the office," and his "deliberat[e] touch[ing] [of her] breasts with some papers that he was holding in his hand" on another occasion, were inadequate to support hostile work environment claim). Nothing in Brierly's complaint or other submissions indicates that any of the discrete events described in this case, assuming they were discriminatory at all, satisfied the requisite severity threshold to create a hostile environment.

■ As noted in Part I.A., *supra*, Brierly cannot oppose the Defendants' motion for summary judgment merely by resting on the allegations in his pleadings. The recital of conclusory allegations unsupported by specific facts is similarly insufficient to withstand a motion for summary judgment. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir.1996). Rather, as the non-movant, Brierly "must present definite, competent evidence to rebut the motion." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Brierly has utterly failed to offer any factual support for his hostile work environment claims under either Title VII or the ADEA, and summary judgment is thus properly granted to the Defendants on both of these claims.

### C. *Brierly's age— and gender-based discriminatory disparate treatment claims must be dismissed.*

■ To establish a prima facie case of adverse age-discriminatory treatment under the ADEA, a plaintiff must show that: (1) he was within the protected age group (forty or over), (2) was qualified for the position he held or sought, and (3) suffered an adverse employment action (4) under circumstances giving rise to an inference of discriminatory intent. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir.2003). Similarly, to establish a prima facie case of discriminatory adverse employment action under Title VII a plaintiff must show that: (1) he belonged to a protected class, (2) was qualified for the position he held or sought, and (3) suffered an adverse employment action (4) under circumstances giving rise to an inference of discriminatory intent.[7]

The Supreme Court has stated that in order to be actionable under federal discrimination laws, an adverse employment action must be "tangible" or "material." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). A "tangible employment action" connotes a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with sig-

7. In "reverse discrimination" claims, such as Brierly's gender discrimination claim, some courts have applied a somewhat stricter (towards the plaintiff) version of the *McDonnell Douglas* standard, holding that a prima facie case of reverse discrimination must indicate some "background circumstances support[ing] the suspicion that the defendant is that unusual employer who discriminates against a [favored group]." *See, e.g., Parker v. Balt. & Ohio R.R. Co.*, 652 F.2d 1012, 1017 (D.C.Cir.1981) (explaining that "[m]embership in a socially disfavored group was the assumption on which the entire *McDonnell Douglas* analysis was predicated"). Although some district courts in this Circuit have applied the heightened standard, *see, e.g., Olenick v. New York Tel.*, 881 F.Supp. 113, 114 (S.D.N.Y.1995) (adopting the *Parker* standard), others have not; *see, e.g., Ticali v. Roman Catholic Diocese of Brooklyn*, 41 F.Supp.2d 249, 260–262 (E.D.N.Y.1999); and the Second Circuit has apparently not taken a position on the issue. *See Seils v. Rochester City Sch. Dist.*, 192 F.Supp.2d 100, 109 (W.D.N.Y.2002). The correct standard need not be determined in this case, since even assuming that Brierly has stated a prima facie case under the stricter standard, he has failed to show that the Defendants' non-discriminatory reasons for their actions are pretextual. *See infra.* Were this opinion to apply the stricter standard, however, it would be significant that the individuals primarily responsible for promoting (or failing to promote) Brierly were primarily *men*, and that the two prior discrimination cases against these Defendants cited by Brierly (as part of his ADEA and retaliation claims) involved *women* complaining of gender discrimination. These facts tend to significantly undermine any claim that "background circumstances" support the suspicion that Deer Park is "that unusual employer" who discriminates against men.

nificantly different responsibilities, or a decision causing a significant change in benefits." *Id.* "Materially adverse" employment actions can also include "a demotion evidenced by a decrease in wage or salary, a less distinguished title, ... or other indices ... unique to a particular situation." *Feingold v. N.Y.*, 366 F.3d 138, 152 (2d Cir.2004) (internal quotations omitted). However, a "bruised ego," a "demotion without change in pay, benefits, duties, or prestige," or "reassignment to [a] more inconvenient job" are all insufficient to constitute a tangible or material adverse employment action. *Burlington Indus., Inc.*, 524 U.S. at 761, 118 S.Ct. 2257 (internal quotations and citations omitted).

Under this standard, Brierly's complaint and other submissions can be fairly read to allege that he suffered three instances of discriminatory treatment at the hands of the Defendants (not including alleged acts of retaliation, which will be addressed in Part II.D, *infra* ): (1) being passed over in favor of Sara Watkin–Fox for the Music Coordinator position in the spring of 1999; (2) being passed over in favor of Dailey for the District Art Director position in the fall of 2000; and (3) being replaced as Marching Band Director by a "significantly younger male" in the spring of 2001. Each event is addressed in turn.

1. *Brierly fails to show that the Defendants discriminated in choosing a Music Coordinator.*

Brierly claimed that the Defendants' choice of Sara Watkin–Fox for the Music Coordinator job was ageist and sexist. Watkin–Fox was undisputedly female and younger than Brierly, and Brierly was presumably qualified for the job. According to Brierly, Watkin–Fox was "probationary," "un-tenured," "with less than two years teaching experience," "would have

difficulty getting [to the High School]," had not completed a Master's degree in School Administration ("a degree already held by plaintiff"), and did not have "any of plaintiff's proven qualifications in band leadership, direction and administration." "Further," insists Brierly, "defendants cannot present one curricular or voluntary performing group achievement that would indicate Ms. Fox even possessed a minimum of the knowledge and experience of plaintiff." It is assumed, for purposes of this discussion, that the circumstances of the decision to award the Music Coordinator position to Watkin–Fox support an inference of discrimination, and that Brierly has established a prima facie case of discriminatory treatment.

■■■ In response to Brierly's claim, the Defendants note two legitimate and non-discriminatory reasons for choosing Watkin–Fox over Brierly: she performed better on her interviews, and unlike Brierly, her "strong employment record" was "untainted by written warnings and reprimands." Both explanations are sufficient to rebut a prima facie case of discriminatory hiring or failure to promote. *See, e.g., Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 104 (2d Cir.2001) ("[t]here is nothing unlawful about an employer's basing its hiring decision on subjective criteria, such as the impression an individual makes during an interview"); *and Reed v. Conn., Dep't of Transp.*, 161 F.Supp.2d 73, 84 (D.Conn.2001) (employee's record of "disruptive" and "insubordinate and uncooperative" behavior, prior written reprimands, and " 'needs improvement' rating for his interpersonal skills" were legitimate, non-discriminatory rationale for employer's failure to promote him).

■■■ In response to the Defendants' stated rationales for choosing Watkin–Fox, Brierly simply re-stresses that he was the more qualified candidate; he also states

that "[o]ther than mere assertion, [sic] defendants have not offered any evidence to support their claims of an un-biased interview process." Neither argument satisfies Brierly's burden, at the third stage of the *McDonnell Douglas* analysis, of rebutting the Defendants' non-discriminatory explanations for their actions.

Although Brierly may have been more qualified than Watkin–Fox in some respects, the Defendants have submitted abundant documentary evidence indicating that Watkin–Fox had excellent qualifications and had received numerous stellar performance reviews and accolades at her prior jobs. Moreover, Brierly does not dispute that he was previously, and repeatedly, unable to work harmoniously with the Defendants. "[A]n employees's opinion about his own qualifications does not suffice to give rise to an issue of fact about whether he was discriminated against, and that is particularly true where the employer's decision whether to promote plaintiff did not depend on whether he was qualified, but whether he was the best candidate for the job." *Hines v. Hillside Children's Ctr.*, 73 F.Supp.2d 308, 320 (W.D.N.Y.1999) (quoting *Layaou v. Xerox Corp.*, 999 F.Supp. 426, 433 (W.D.N.Y. 1998)).

As far as the selection process was concerned, the Defendants offered evidence in the form of affidavits that they (1) conducted screening interviews of three candidates, and selected Brierly and Watkin–Fox for additional interviews; (2) conducted a second round of interviews; (3) then requested written responses to three questions from the two remaining candidates; (4) which were circulated (with the candidates' names redacted) to three administrative staff members (all over age forty, and two male) who independently reviewed the responses and found (by a vote of 2–1) that Watkin–Fox's responses were superior. Brierly has offered no evidence to suggest that this seemingly thorough and professional procedure was actually a subterfuge for discrimination.

Brierly's arguments suggests a misunderstanding of the underlying burden of proof applicable at this stage of the *McDonnell Douglas* analysis. The Defendants are not required to prove that Watkin–Fox was the superior candidate; they are only required to offer non-discriminatory explanations for how and why they chose her over Brierly. They have done so. It is Brierly's responsibility to offer some evidence, beyond his own conclusory statements, indicating that the proffered non-discriminatory reasons are pretextual, or that the Defendants' actions were actually motivated by discriminatory animus. Brierly has failed in this task. As already suggested, Title VII may not be used as a "vehicle for second-guessing an employer's business judgment." *Davidson v. Time, Inc.*, 972 F.Supp. 148, 153 (E.D.N.Y.1997). But Brierly does exactly that when he argues that he was the better-qualified Music Coordinator candidate, and that the Defendants' interview process was deficient. These arguments do not suffice to show pretext on the Defendants' part, and thus fail to prevent summary judgment on this point.

2. *Brierly fails to show that the Defendants discriminated in choosing a Director of Fine and Performing Arts.*

Brierly fails to indicate any triable issue of discrimination in the Defendants' selection of a "Director of Fine and Performing Arts," for essentially the same reasons that he failed to show any triable issue of discrimination behind the selection of a Music Coordinator. Again, even assuming that Brierly has stated a prima facie case of discrimination, the Defen-

dants have offered ample non-discriminatory explanations for their choice of Dailey over Brierly.

As the Defendants explain, "Director of Fine and Performing Arts was an administrative position," and the Defendants looked at the candidates' "experience in terms of running and supervising multiple departments." Dailey's resume lists numerous academic achievements, including a Ph.D. in education theater from N.Y.U., and certification in eleven areas of teaching and educational administration. Dailey had experience as an Assistant Principal in New York City, in which position he had "supervised all instruction in english, music, art, and library," "created budgets," "evaluated staff," "conducted staff development," "devised new courses," "maintained inventory," "handled scheduling difficulties," and "made the schedule." The Defendants have, again, also offered ample evidence that Dailey out-performed Brierly during the interview process; specifically, that Brierly "based every single answer on the marching band. His answers were not reflective of the music department or the art department," and that Brierly "was not able to answer questions regarding departmental supervision and departmental responsibilities." Brierly's only response to these clearly legitimate and non-discriminatory reasons for choosing Dailey for the Director's position is the following statement: "Even accepting *arguendo* that Dr. Jeff Dailey possessed more academic qualifications, defendants cannot support their contention that he was the 'outstanding candidate.' Dailey's experience did not include the professional, developmental, administrative and leadership qualities possessed by the plaintiff."

█ Brierly's responses to the Defendants' proffered non-discriminatory rationales for selecting Dailey echo his responses to the Defendants' rationales for

choosing Watkin–Fox: that he was simply a better candidate. A plaintiff's subjective perceptions of his own abilities are not sufficient to show pretext and avoid summary judgment on his discrimination claims. *Venti v. EDS*, 236 F.Supp.2d 264, 276 (W.D.N.Y.2002). Accordingly, summary judgment is appropriately granted on this claim as well.

3. *Brierly cannot show that his replacement as band leader was discriminatory.*

█ Brierly's final claim of discriminatory treatment pertains to his removal as director of the marching band. Since Brierly was not actually fired from his job, but was simply transferred to the Intermediate School and (by his own account) "remov[ed] from his position as co-curricular marching band director," this event is properly considered a demotion. Demotions are, of course, actionable under the federal discrimination laws, but with a slightly varied version of the prima facie requirement. To establish a prima facie case of discriminatory demotion under Title VII (and thus under the other statutes as well), a plaintiff must show that (1) he is a member of a protected class, (2) was qualified and *satisfactorily performing the duties required* by his position; and (3) was demoted from the position (4) under circumstances giving rise to an inference of discrimination. *Walker v. Rochester Tel. Corp.*, No. 90 Civ. 1066, 1992 WL 518685, at *4 (W.D.N.Y. April 14, 1992) (emphasis added).

█ Brierly's own letters and memoranda in the record indicate that he was unwilling to continue fulfilling his band director responsibilities unless the Defendants offered him additional salary, time, or teaching credits. He thus indicated an unwillingness to perform his job in a satisfactory manner and fulfill one of his pri-

mary duties. Brierly has thus not even stated a prima facie case of discrimination. *See Etienne v. Wal–Mart Stores, Inc.,* 186 F.Supp.2d 129, 134 (D.Conn.2001).

■ Moreover, even assuming, generously, that Brierly has stated a prima facie case of discrimination, the Defendants have stated a legitimate non-discriminatory reason for failing to accommodate his unilateral demands. Specifically, the Defendants have offered evidence that (1) "the School could not accommodate him because his compensation was nonnegotiable, since it was the result of prior negotiations between the School and the teachers' union as reflected in the current Deer Park Teacher Association's contract," and (2) "[a] non-competitive Marching Band was not an option because the Board of Education affirmatively decided against it." Brierly has offered nothing to indicate that these non-discriminatory explanations are pretextual. For this reason as well, he has failed to show that his demotion was discriminatory. Summary judgment on this claim is warranted.

### D. *Brierly's retaliation claims must be dismissed.*

Fairly read, Brierly's complaint states the following specific retaliatory acts by the Defendants: (1) refusing to select Brierly to be Music Coordinator; (2) refusing to select Brierly to be District Art Director; (3) rejecting Brierly's proposals to revamp the Marching Band as a co-curricular activity; (4) failing to inform Brierly that he would not be rehired as band director; (5) "falsely claiming that [Brierly] was 'close to an attendance concern' "; and (6) transferring Brierly to the Intermediate School.

■ To establish a prima facie case of retaliation, under either Title VII or the ADEA, an employee must show: (1) that he participated in a "protected activity,"

and that this participation was known to the defendant; (2) the occurrence of an adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action. *Terry v. Ashcroft,* 336 F.3d 128, 141 (2d Cir.2003). As with direct discrimination claims, once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the allegedly retaliatory employment decision. If the defendant does so, the burden returns to the plaintiff, who must show that the articulated non-discriminatory reason for defendant's action is in fact a pretext for retaliation. *See Jetter v. Knothe Corp.,* 324 F.3d 73, 75–76 (2d Cir.2003).

■ To show that he engaged in a protected activity, the plaintiff "need not establish that the conduct he opposed was in fact [discriminatory]," so long as the plaintiff demonstrates that he had a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988). In this case, notwithstanding the Defendants' arguments to the contrary, it will be assumed that Brierly was engaged in a protected activity when he warned the Defendants that he would cooperate in, and when he actually did cooperate in, Cullinane's civil action. Further, although the Defendants strenuously insist that they were unaware of Brierly's intention of testifying in Cullinane's suit until after his 2001 resignation, the Court accepts Brierly's assertions that he apprised the Defendants of his "protected activities" in December 1998 and again in 1999 or 2000, as he is opposing summary judgment. *See* Part I.A, *supra.*

■ "Proof of causal connection can be established *indirectly* by showing that the

protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or *directly* through evidence of retaliatory animus directed against a plaintiff by the defendant." *DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir.1987) (emphases in original) (internal citations omitted). In this case, Brierly does not offer any direct evidence of retaliatory animus directed against him, but he does suggest that two other teachers at the High School suffered retaliatory actions after complaining of discrimination or harassment, and that the "facts and circumstances" indicate that he did as well. It will be assumed that Brierly has shown a sufficient inference of a causal connection between his protected activities and the purportedly retaliatory actions taken by the Defendants.[8]

Even assuming that Brierly has established participation in protected activities, the Defendants' knowledge of his participation, and an inferable "causal connection" between his activities and actions taken by the Defendants, each and every one of Brierly's specific retaliation claims fails to survive summary judgment for one of two reasons: the lack of a "materially adverse" employment action, or the failure to show pretext behind the Defendants' legitimate, non-retaliatory reasons for their actions.

1. *Brierly fails to show that the Defendants' previously discussed non-discriminatory rationales for refusing to promote him and rejecting his band proposals are pretexts for retaliation.*

Brierly's claims that the Defendants retaliated against his protected activities by refusing to promote him to Music Coordinator, refusing to promote him to Director of Fine and Performing Arts, and rejecting his proposals for revamping the marching band essentially overlap with his earlier claims that the Defendants flat-out discriminated against him. There is no reason to rehash the entire *McDonnell Douglas* analysis here; it is sufficient to note that the Defendants offer the same non-discriminatory reasons for their actions as they did earlier (in Parts II.C.1, 2, & 3, *supra*), and Brierly once again fails to offer any indication that these reasons are pretextual. Accordingly, summary judgment on these retaliation claims is warranted.

2. *Because Brierly has failed to explain why the Defendants' failure to inform him that he would not be rehired as band director was an "adverse employment action," this claim of retaliation fails.*

As mentioned, in addition to alleging that the failure to rehire him as band leader was discriminatory and retaliatory, Brierly's complaint states that the Defen-

---

**8.** The Defendants argue that Brierly has failed to establish any evidence of a causal connection between his "protected activities" and the allegedly retaliatory treatment he suffered, because of insufficient "temporal proximity." It is true, as the Defendants argue, that the passage of several months or more between a protected activity and an adverse employment action tends to negate any inference of retaliation. *See Gorman–Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir.2001). However, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Id.* For this reason, and because it is unclear from Brierly's submissions and the undisputed record as to when, exactly, Brierly's purportedly protected activities occurred and when, exactly, the alleged retaliatory actions were taken, a causal connection will simply be assumed.

dants' failure to *inform* him in advance that he would not be rehired was itself a form of retaliation. However, it is not at all clear how or why this act or omission is sufficiently "material" or "tangible" to constitute an "adverse employment action" under federal law. This Court's independent research failed to locate any similar federal precedents. More importantly, nothing in Brierly's memorandum of law or other submissions explains this point; in fact, outside of the complaint itself, he does not mention this claim at all. This argument is accordingly deemed abandoned. *See, e.g., Anti–Monopoly, Inc. v. Hasbro, Inc.*, 958 F.Supp. 895, 907 n. 11 (S.D.N.Y.1997) ("failure to provide argument on a point at issue constitutes abandonment of the issue.").

### 3. Brierly cannot state a claim for "retaliatory reprimand."

 Brierly argues that the formal reprimand he received from Bologna regarding his attendance record was an actionable act of retaliation. However he offers no suggestion that this reprimand actually had any tangible effect on his employment. Reprimands that do not lead to materially adverse employment consequences are generally not considered actionable forms of retaliation. *See Scott v. Bell Atl. Mobile*, No. 98 Civ. 7245, 2002 WL, 550969, at *5 (S.D.N.Y. April 11, 2002) (citing *Stembridge v. City of New York*, 88 F.Supp.2d 276, 283 (S.D.N.Y.2000)). *See also Brown v. Brody*, 199 F.3d 446, 458 & n. 11 (D.C.Cir. 1999) (formal criticisms or poor perform-

ance evaluations generally not tangible adverse actions if not affecting employee's "grade or salary") (collecting cases); *and Broderick v. Donaldson*, 338 F.Supp.2d 30, 42 (D.D.C.2004) (although reprimand letter, by "affecting [ ] supervisors' impressions," may "indirectly affect" employee's subsequent obtainment of promotions or higher performance evaluations, such letter "in and of itself, does not constitute an adverse personnel action."). Since Bologna's letter reprimanding Brierly was not a materially adverse employment action, it cannot be the basis for a retaliation claim.

### 4. Brierly fails to rebut the Defendants' legitimate, non-retaliatory reasons for transferring him to the Intermediate School.

The final retaliatory act that Brierly alleges is his transfer to the Intermediate School. The Defendants argue that this act does not constitute an "adverse employment action," because it did not reduce Brierly's salary or benefits, it did not harm his career, and it was not "materially less prestigious," or "materially less suited to his skills and expertise." These points are debatable,[9] but it will be assumed that Brierly's transfer *did* constitute a materially adverse employment action, and that Brierly *has* stated a prima facie case of retaliation in this regard.

 In response to this claim, the Defendants have offered two rationales for transferring Brierly: first, he was needed

---

**9.** As noted previously, Brierly claims that the transfer "precluded any involvement in the [High School] performing musical groups," for which he had "received extra stipends." However, his repeated complaints in the years before his transfer that he was spending too much of his personal time and money running the High School band tend to suggest that the transfer would have *saved* Brierly

some money. The Defendants' claims that teaching music lessons in the Intermediate School was not materially less suited to Brierly's skills and expertise is also questionable, when Brierly's negative teaching evaluations at the High School are compared with his proven results as a band leader. And the relative prestige involved in teaching at each respective school is entirely unknown.

to teach brass players in the Intermediate School; and second, the Defendants assumed that Brierly had resigned as Marching Band Director, and they wanted the new director to work within the High School, but "did not want the plaintiff, given his history, and the new band director working in the same office and building."

 Obviously, the Defendants' determination that someone was needed to teach the Intermediate School brass players, and that Brierly had the requisite skills to do so, was well within the Defendants' field of professional judgment, and is a non-discriminatory rationale for transferring Brierly. *See, e.g., Evans v. City of New York*, No. 00 Civ. 4197, 2003 WL 22339468, at *10 (S.D.N.Y. Oct 14, 2003) (lack of need for plaintiff at prior position and his usefulness at new position are legitimate rationales for transfer). More importantly, it is well-established that the "personalities of people and their ability to work together" is a legitimate, non-discriminatory factor that an employer may consider in its employment decisions. *See Frockt v. Olin Corp.*, 344 F.Supp. 369, 371 (S.D.Ind.1972); *and Barnes v. Lerner Shops of Tex., Inc.*, 323 F.Supp. 617, 622 (S.D.Tex.1971); *see also Ebbin v. Indep. Television Network*, No. 95 Civ. 10097, 1997 WL 441943, at *4 (S.D.N.Y. Aug.5, 1997) (personality or attitude are legitimate non-discriminatory reasons for dismissal); *and Allen v. City of Yonkers*, 803 F.Supp. 679, 708 (S.D.N.Y.1992) ("Conflicts with those in authority may constitute valid reasons for discharge, whether or not the conflict entails fault on the part of the employee."). The federal discrimination statutes bar retaliation against the exercise of protected rights; "they do 'not clothe the complainant with immunity for past and present inadequacies, unsatisfactory performance, and *uncivil conduct.*'"

*Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 828–29 (1st Cir.1991) (quoting *Jackson v. St. Joseph State Hosp.*, 840 F.2d 1387, 1391 (8th Cir.1988)) (emphasis added).

Brierly's response to these points is to restate his contention that the transfer *was* an adverse employment action; but he does not offer any evidence suggesting that the Defendants' stated reasons for the transfer were pretexts for retaliation. On this point as well, therefore, Brierly has failed to defeat the Defendants' motion for summary judgment.

E. *Summary: Brierly has failed to show any triable issue of discrimination.*

It may be assumed that John Brierly was an accomplished high school band director and music teacher. It may also be assumed that he would have made a better "Music Coordinator" or "Director of Fine and Performing Arts" than the individuals chosen by the Defendants for those positions. And it may be assumed further that the Defendants treated Brierly poorly because of the workplace disputes and animosity recounted in this opinion. None of this, however, means that the Defendants violated federal law.

Title VII is "a protection against unlawful discrimination and retaliation, not a vehicle for checking day to day decisions of [employers], particularly as they relate to hiring, firing, promoting, reprimanding, or evaluating their employees." *Broderick v. Donaldson*, 338 F.Supp.2d 30, 47 (D.D.C. 2004). "Title VII does not guarantee employment to everyone, nor did Congress authorize federal courts to address and remedy every form of unfair, arbitrary, petty or even unlawful action by employers against prospective, existing or former employees." *Schildkraut v. Bally's Casino New Orleans, LLC*, Nos. 04 Civ. 366 & 04 Civ. 504, 2004 WL 2348321, at *10

(E.D.La. Oct.14, 2004). Similarly, "the ADEA does not make employers liable for doing stupid or even wicked things; it makes them liable for discriminating," *Norton v. Sam's Club*, 145 F.3d 114, 120 (2d Cir.1998), and "[a]n employer does not violate the law by making an erroneous evaluation of an employee." *Rodriguez v. Am. Friends of Hebrew Univ., Inc.*, No. 96 Civ. 240, 2000 WL 1877061, at *5 n. 7 (S.D.N.Y. Dec. 26, 2000).

Brierly has failed to identify sufficient evidence in the record to permit a reasonable trier of fact to conclude that unlawful discrimination was a motivating factor in the Defendants' treatment of him. His federal discrimination claims must therefore be dismissed.

### III. Brierly Has Failed to State Any Independent Cause of Action Under Title IX or Section 1983.

While Brierly's complaint mentions Title IX, none of his further submissions discuss that statute. This claim accordingly may be deemed waived. Additionally, Title IX gender discrimination claims are reviewed under the same standards as Title VII gender discrimination claims. *See* Part I.C, *supra*. Since Brierly's gender discrimination claims have been thoroughly reviewed under Title VII and found insufficient to withstand summary judgment, it may be assumed that any similar or related Title IX claims must similarly fail.

 Brierly's Section 1983 claims are nearly as unelaborated as his Title IX claims. Beyond his perfunctory arguments regarding the Defendants' "policy and practice of discrimination" and lack of entitlement to qualified immunity, Brierly does not discuss Section 1983 at all. At any rate, a municipality or other governmental entity cannot be held liable for an alleged policy or custom unless its agents actually violated the victim's constitutional rights in the first place. *See Hayden v. Grayson*, 134 F.3d 449, 456 (1st Cir.1998), citing (*City of L.A. v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986)). Since Brierly fails to prove that he suffered any unlawful discrimination and thus that his rights were actually violated, his claims regarding any municipal custom or policy are necessarily moot, and any discussion of the Defendants' immunity irrelevant.

### IV. This Court Declines, in Its Discretion, To Consider Brierly's State Law Claims.

 The decision whether to exercise supplemental jurisdiction is left to the discretion of the district court. *Ametex Fabrics, Inc. v. Just In Materials, Inc.*, 140 F.3d 101, 105 (2d Cir.1998). Under 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction over a state law claim where, as here, it dismisses all of the federal claims over which it has original jurisdiction. Since none of Brierly's disputes with the Defendants are cognizable under federal law, this Court will decline to exercise supplemental jurisdiction over Brierly's state law claims.

### CONCLUSION

For all of the above reasons, the Defendants' motion for summary judgment is GRANTED in its entirety, and Brierly's action is DISMISSED. The Clerk of Court is directed to CLOSE this case.

SO ORDERED.