**Michael A. LINCOLN, Plaintiff,**

v.

**John E. POTTER, Postmaster General, United States Postal Service, Defendant.**

**No. 04 CIV. 10235(CM).**

United States District Court, S.D. New York.

Jan. 23, 2006.

Robert Nathan Isseks, Robert W. Hiatt, P.C., Staten Island, NY, for Plaintiff.

John Peter Cronan, U.S. Attorney's Office, New York, NY, for Defendant.

### DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART MOTION FOR LEAVE TO AMEND THE COMPLAINT

MCMAHON, District Judge.

Defendant moves for summary judgment in this age discrimination case. Plaintiff cross moves for leave to amend the complaint to assert new causes of action for hostile work environment and retaliation.

The motion for summary judgment on the claim originally asserted by plaintiff—age discrimination in the redesign of his postal route—is granted. Although the record contains disputed issues of fact, plaintiff has failed to raise a genuine issue of fact on the one issue that matters—whether his age was the motivation behind the Postal Service's decision to redesign his postal route.

The motion for leave to amend is granted in part and denied in part. Plaintiff can amend his complaint to assert a claim of retaliation that allegedly resulted in a material change in his work conditions after he filed this action and made discovery

demands. His new claim for hostile work environment, however, could have been asserted in his original complaint or long before the court-imposed deadline for the amendment of pleadings, and so will not be allowed.

### STATEMENT OF FACTS

Unless otherwise noted, the facts are undisputed or interpreted most favorably to plaintiff.

Plaintiff Michael A. Lincoln is a letter carrier employed by the United States Postal Service in Newburgh, New York. Plaintiff is fifty-five years old. He was first employed by the Postal Service from August, 1968, until April, 1971. After a period of employment elsewhere, plaintiff returned to work for the Postal Service at the Newburgh Branch of the Newburgh Post Office in February, 1980.

From around 1985 to the present, plaintiff has been assigned to deliver mail to the same route: Route Thirteen in Newburgh. Up until 2002, Route Thirteen was comprised of approximately 430 individual deliveries and took plaintiff approximately five and one-half hours to deliver ("street time").

In preparation for delivery, letter carriers spend time in the office sorting their letters ("office time"). When plaintiff began working for the Postal Service all sorting was done by hand. In the mid 1990's, the Postal Service implemented an automated mail sorting system called Delivery Point Sequence ("DPS"). DPS would mechanically sort certain types of mail and deliver it to the letter carrier responsible for its delivery. Consequently, the implementation of DPS reduced letter carriers' office time.

In 2002, the Postal Service decided to evaluate[1] the routes of letter carriers at the Newburgh Post Office to assess the impact of the DPS implementation. The Newburgh Branch evaluation was overseen by Stephen Radakovits, Postmaster of the United States Post Office in Chester, New York, and Sherry Cron–Bertrand, Supervisor of Customer Services from Saugerties, New York. Any final decisions on route adjustments were to be made by local management of the Newburgh Post Office.

Radakovits and Cron–Bertrand examined a week's worth of route inspections that had been conducted by supervisors of customer service between October 30, 1995 and November 4, 1995. They did this to establish how long it took each carrier, on average, to complete his/her day's work. The data were memorialized in the form of a DPS Impact Statement, which showed how many hours it actually took each carrier to finish his/her workday. Carriers whose average workday was either above or below eight hours were eligible to have their routes adjusted in order to give them an eight-hour workday.

The DPS Impact Statement revealed that plaintiff's workday should take him seven hours and eighteen minutes to complete. (*See* Radakovits Decl. ¶ 9.) Plaintiff was not the only employee of the Newburgh Post Office to have a DIS score of less than eight full hours of work.

In August, 2002, Radkovitz and Cron–Bertrand held a meeting with management officials and local union officials for the Newburgh Post Office. Everyone in attendance agreed that seventeen routes in the Newburgh branch needed some form of adjustment. (*Id.* ¶ 10.) Joseph Schellace, age forty-five in 2002, received an additional twenty-six minutes of work; Shirley Crawford, age forty-eight, received an additional twenty-eight minutes of work; Jeffrey McEwen, age thirty, re-

---

1. Authorized under § 141 of the Postal Service's M–39 Handbook.

ceived an additional forty-three minutes of work; Wendy Somers, age thirty-two, received an additional two hours and twenty-one minutes of work; Blanche Drapun, age fifty-one, received an additional three hours and nineteen minutes of work; Joseph DeRobertis, age fifty-one, received an additional one hour and two minutes of work.

At a meeting on or about September 19, 2002, plaintiff was told by Radkovits that he averaged forty-two minutes under-time each day, and that his route would be augmented to include Valley Avenue. Plaintiff responded that he would, ". . . ask for help if it call[ed] for it." (Gurda Decl., Ex. J at 3, Aug. 5, 2005.)

Plaintiff concluded that the addition of Valley Avenue required an additional forty to forty-five minutes of street time and ten to fifteen minutes of office time.

Shortly after the addition to plaintiff's route, Supervisor Donald Darien accompanied plaintiff on his route. On that day, it took plaintiff nine hours and forty minutes to complete his appointed rounds, not including a thirty minute lunch break. Forty-six minutes were spent delivering Valley Avenue.

A carrier who believes he or she has too much work on his or her route can ask management to conduct a special inspection of his or her route. On such an inspection, the route is followed for six days—the same length of time as the 1994–95 inspections that formed the basis of the 2002 DPS Impact Statement. If a special inspection reveals that plaintiff's route is in fact overly burdensome, it is supposed to be adjusted accordingly. (See McGuire Decl. ¶ 8.)

After Valley Avenue was added to plaintiff's route, he requested a special inspection of his route. His request was denied because, for reasons that are not revealed in the record, plaintiff did not work for four of the twelve weeks prior to making the request. Apparently, a postal worker will only be given a special route inspection if he works a full twelve weeks prior to making the request.

Within a few weeks after his request was denied, plaintiff has been on the job for the necessary twelve weeks. In a classic instance of Governmental stand-off, plaintiff refused to renew his request for a special route inspection, while defendant refused to order an inspection based on plaintiff's earlier request that had been denied as untimely. Plaintiff decided that it was up to management to prove to him that his route was not too long (Pl.'s Dep. 126:19–126:22.); his supervisors stood fast to the letter of their regulations. As a result, no special inspection analogous to the 1994–95 inspection was ever performed.

On April 18, 2005, however, Supervisor George Stengal accompanied plaintiff on his route for one day, as Darien had just after the route was augmented. It took plaintiff nine hours and thirty-four minutes to complete his rounds on that day. However, Stengal concluded that plaintiff could have completed the route ninety minutes sooner than he actually did. Stengal noted twelve changes to the route that, in his opinion, could have saved plaintiff about twenty-eight minutes. Stengal also observed that plaintiff backtracked on his route ten times, either because of a DPS sorting failure or because he left mail bundles in the delivery car. These endeavors cost plaintiff another twenty-eight minutes. Finally, Stengal reported that plaintiff failed to "finger" the mail before arriving at mailboxes. There are four hundred and seventy-six deliveries on the new route. Stengal approximated that it took plaintiff five seconds at each mailbox to finger the mail. Five seconds, four hundred and seventy-six times, would equal a loss of forty minutes.

Plaintiff has repeatedly asked to discuss Stengal's conclusions (which plaintiff disputes as a factual matter) with his supervisors. According to plaintiff, no one will talk to him.

One thing is quite clear: plaintiff has obtained a great deal of help with his route since it was altered in 2002. Postal Service Form 3996 can be submitted by a carrier if he or she believes assistance will be needed in order to complete his or her workday. If approved, management assigns another carrier to help with the route. Between the time Valley Avenue was added to his route in 2002 and July 13, 2005, plaintiff submitted a 3996 form *every morning.* His request for help was granted every day but three. Each time Lincoln's 3996 request was granted, plaintiff's supervisor would assign another carrier to deliver the Valley Avenue portion of Route Thirteen. At all times, plaintiff did the office-based work needed to prepare for Valley Avenue deliveries. This office time has not "significantly impacted" plaintiff's workday. (Pl.'s Dep. ¶ 105.)

Plaintiff believes that his co-workers made fun of him because he needed so much help to complete his route.

### Administrative and Court Proceedings

On March 14, 2004, plaintiff filed a formal complaint of age discrimination with the Postal Service. The claim alleged that his September 19, 2002 route adjustment violated plaintiff's rights under the Age Discrimination in Employment Act, 29 U.S.C. § 621.

Plaintiff invoked his right to a hearing before the United States Equal Employment Opportunity Commission (EEOC). However, on July 20, 2004, the Postal Service filed a motion requesting a decision without a Commission hearing, in accordance with 29 C.F.R. § 1614.109(g)(1). Administrative Judge Cuevas treated the Postal Service's request as a motion for summary judgment and granted it, over plaintiff's opposition, in October 2004.

Plaintiff timely commenced this action on December 27, 2004, alleging age discrimination in employment. He sought damages and an order restoring his original delivery route.

On June 15, 2005, plaintiff contacted defendant and requested production of plaintiff's 3996 request forms as part of the discovery in this action. He alleges that less than one month later, on July 13, 2005, Postal managers announced they would no longer grant his 3996 requests and told him that, from then on, he would be required to deliver Valley Avenue himself. Plaintiff's boss denies that any of this took place, because he (McGuire) was not at work that day. (See McGuire Decl. ¶ 3.) McGuire also contends that the Postal Service has granted plaintiff's requests for assistance at least four times since July 13, 2005. (See Id. at 4–8.) Defendant does, however, concede that it told plaintiff the Postal Service would no longer routinely grant plaintiff's requests for help. Defendant claims that this was because the Newburgh Post Office was short staffed during the summer of 2005.

On the days when plaintiff did not obtain assistance, he delivered the entire route himself. On days when it took more than eight hours, he was paid overtime. (*See* McGuire Decl. ¶ 7.) However, plaintiff asserts that Postal Manager Doreen Deluca censured him on July 26, 2005, for failing to complete his route in eight hours or less. Defendant does not deny that this occurred.

### *Discussion*

#### Motion for Summary Judgment

The first item on the agenda is resolution of defendant's motion for summary judgment dismissing the claim plaintiff has

already asserted—age discrimination in the alteration of his postal route back in 2002. Defendant's motion is granted.

A party is entitled to summary judgment pursuant to Rule 56 when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. United States Veterans Admin.,* 870 F.2d 57, 60 (2d Cir.1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation" and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998); *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. 1348 (citations omitted). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

In order to establish a claim of age discrimination under the ADEA, plaintiff must satisfy the three-part analytical framework set forth in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, plaintiff must establish, by a preponderance of the evidence: (1) membership in a protected group; (2) qualification to perform the duties of the position; (3) an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas,* 411 U.S. at 793, 93 S.Ct. 1817; *James v. New York Racing Ass'n.,* 233 F.3d 149, 153–154 (2d Cir.2000) (applying the *McDonnell Douglas* analysis to ADEA claims).

Assuming, *arguendo,* that plaintiff has met the minimal burden of establishing a *prima facie* case of age discrimination, a presumption of discrimination arises and the burden shifts to the defendant to proffer "a legitimate, nondiscriminatory reason" for the employment action. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

The defendant easily meets its burden of demonstrating a legitimate nondiscriminatory reason for changing plaintiff's route. The Postal Service decided to adjust plaintiff's route because the DPS Impact Statement—an objective, statistical evaluation of all routes at the Newburgh Post Office—indicated that plaintiff was (or should have been) working less than an eight hour day. Moreover, many routes, not just plaintiff's, were adjusted on the same basis on the same date.

Once defendant has established a legitimate reason, the burden shifts back to plaintiff to show that "the proffered nondiscriminatory reason was pretextual [and] also that the defendant discriminated

against the plaintiff." *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 91 (2d Cir.2001) (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). The question is whether plaintiff has met this burden.

Plaintiff claims that his route increase was the part of some scheme by the Postal Service to make him "become frustrated that [he] was given an ... addition onto [his] route and leave it in a huff." (Pl.'s Dep. 10:25–11:2.) After he gave up his route, plaintiff claims that the Postal Service "would get *another person* to ... do it all in an eight hour ... day." (*Id.* 11:5–11:8.) (emphasis added).

But plaintiff offers nothing to support this theory other than mere speculation and conjecture. Plaintiff concedes that no one at the Postal Service ever stated that he/she wanted someone else to take over his route. No official at the Postal Service made any comment that led plaintiff to believe the Postal Service wanted someone else to take over his route. Even more telling, plaintiff admits no one at the Postal Service ever made a comment suggesting a desire to have a younger carrier take over plaintiff's route, or engaged in any conduct that caused him to suspect the Postal Service wanted a younger carrier to take his route. (Pl.'s Dep. 11–12.)

Plaintiff further claims that, of all the carriers who had their routes increased, his was the only one with no "downtime" (by which he means that it took him more, not less, than eight hours to finish his work before his route was adjusted). Plaintiff testified that it took him eight and one half hours to complete his old route. (Pl.'s Dep. 8:12–8:13.) And he observes that the inspection conducted by Don Darien after Lincoln's route was changed re-

vealed that it took plaintiff nine hours and forty minutes to complete his work—of which 40 minutes were spent delivering Valley Avenue. Plaintiff also notes that he was the only carrier to indicate at the time that his route was adjusted that he might need help to deal with his new responsibilities.[2]

There is certainly a disputed issue of fact over whether plaintiff actually had or lacked downtime. The data used to create the DPS indicate that plaintiff's average work day should have been less than seven hours, but those data were seven years old when the route adjustments were made. It is true, of course, that every other postal worker's work day (regardless of age) was also measured with seven year old data, and every one of the many route adjustments that were made in 2002 were made based on that data. However, there is evidence that, shortly after the plaintiff's route was adjusted, the Postal Service became aware that it took plaintiff substantially longer than eight hours to complete his new route: both Darien's one day route inspection and (more important) plaintiff's daily requests for assistance (which were routinely granted) sent that message. And a second one-day inspection revealed that, in 2005 (after this lawsuit began), it took plaintiff nine and one half hours to complete his route! That the time-study man who accompanied plaintiff concluded there were more efficient ways for plaintiff to deliver the mail is not dispositive—especially where, as here, plaintiff claims that the time-study man got his facts wrong.

It is true that plaintiff could have obtained a special inspection of his route—which the undisputed evidence shows would have resulted in an adjustment if his

---

**2.** "Plaintiff had to sign a form (Form 1840) at the time his route was adjusted". On that form, plaintiff indicated that he was "Going to ask for help *if* it calls for it."(Gurda Decl., Ex. J at 3, Aug. 5, 2005.)

contention was correct (*See* McGuire Decl. ¶ 8.)—if only he had renewed the request for inspection that was denied on purely technical grounds when he first made it. The special inspection would have resolved the factual issue for once and for all, because the reinspection data would have revealed how long it took, on average, to complete the route at the time the change was made, rather than seven years earlier.

However, the fact that no special inspection took place neither compels the conclusion that plaintiff's route was not overly burdensome nor eliminates the genuine issue of fact concerning the amount of time it should have taken plaintiff to deliver his old route plus Valley Avenue. It just means that the Government could have saved the taxpayers some money by inspecting plaintiff's route when he first asked for reinspection.

But plaintiff has to do more than raise a genuine issue of fact about the duration of his revised route. He has to raise a genuine issue of *material* fact—and what is material is the reason why the route was changed, not whether the Postal Service made a bad business decision. *See Okeke v. Southside Hospital,* No. 02–Civ–5935, 2005 WL 1959461, at *5 (E.D.N.Y. Aug.9, 2005). This plaintiff has not done.

To support his claim that age discrimination lay at the root of his treatment, plaintiff notes that five of the seven carriers who had their routes increased were over the age of forty. However, most of the carriers who got route decreases were also over the age of forty. (Compl.¶ 15.) The street that was added to plaintiff's route was taken from the route of another member of the protected class, a forty-nine

year old carrier named Dallas, whose DPS score indicated that his route took, on average, eight hours and twenty minutes. And some workers who were not in the protected class also got additional work in the reorganization.

The fact is, data from the same 1994–95 study were applied to every carrier's route when the adjustments were made in 2002, regardless of the carrier's age. There is no evidence in the record before me that any postal worker who was not in the age-protected class either failed to get more work if his route time averaged less than eight hours or failed to get less work if his route time averaged more than eight hours. In short, the evidence shows that, at the time of the route redesign, all postal workers of all ages were treated exactly alike. There is no evidence to suggest that plaintiff's supervisors wanted to get rid of him because of his age, or that there was any plot afoot to get rid of older workers when the time the routes were redesigned.

Plaintiff also argues that the Postal Service's refusal to remove Valley Avenue from plaintiff's route after Donald Darien's inspection evidences age discrimination. His argument is not compelling.

After Darien's inspection showed that it took plaintiff well over nine hours to complete his redesigned route,[3] plaintiff asked for a full route inspection. His request was denied on technical grounds because plaintiff made the request prematurely (before he had worked enough weeks on the new route to qualify for a reinspection). The Postal Service did not conduct a reinspection even though it was granting

---

3. Defendant contends that plaintiff was not actually working for a full nine hours and forty minutes on the day of Darien's inspection. The form completed by Darien simply indicates the time when plaintiff arrived at work (8:00 a.m.) and when he left (6:10 p.m.), and subtracts a thirty minute lunch break to arrive at the nine hour and forty minute figure. However, plaintiff asserts that he was working from the time he arrived until the time he left. At best, there is an issue of fact on that issue.

requests from plaintiff for help completing his route on a daily basis.

I gather that plaintiff would have me infer that the Postal Service's refusal to reinspect his route evidences an unstated desire to torment plaintiff by heaping work on him, so he would become discouraged and leave. I further surmise that plaintiff would have me infer that the only conceivable reason the Postal Service would want him to retire is that he was an older worker. The Government, of course, insists that it was simply sticking to the letter of its regulations, and that plaintiff had to make a *timely* request for reinspection before it could conduct a reinspection—regardless of the reality that confronted it each and every day for two and one half years.

It is unfathomable that the Postal Service would stand on ceremony for thirty months when the evidence of each and every day's behavior suggests that the 1995 data used to realign the routes may have become outdated by 2002. After granting requests for extra assistance for, say, a year (to give the Service the benefit of the doubt), any reasonable private employer would probably have concluded that the matter ought to be reexamined. However, a bureaucrat's mindless adherence to regulations does not necessarily give rise to an inference of discrimination. Plaintiff's conjecture that his age was the reason for the Service's behavior may make sense to him, but it would not be enough for a trier of fact to conclude that, "the proffered reason was false and that discrimination was the real reason." *Faggiano v. Eastman Kodak Co.*, 378 F.Supp.2d 292, 300 (W.D.N.Y.2005) (citing *Austin v. Ford Models, Inc.*, 149 F.3d 148, 152 (2d Cir.1998)). For all I know, plaintiff's superiors cared not a whit about his age; they simply thought the man was a pain in the neck. Certainly, plaintiff's refusal to renew his reinspection request at a time when it would have been granted suggests that he was capable of behaving every bit as intransigently as the Postal Service.

In short, while plaintiff raises a number of genuine issues of fact, he has not raised a genuine issue of fact on the only issue that is material to third-step *McDonnell Douglas* analysis: whether the employer's action can fairly be attributed to age discrimination and not to some other reason (pretext). For that reason, the motion for summary judgment dismissing plaintiff's claim of age discrimination in the redesign of his route must be granted.

### MOTION TO AMEND THE COMPLAINT

Plaintiff moves for leave to add two claims to his complaint. The motion is granted in part and denied in part.

### A. RULE 16(b)

■ According to Rule 15 of the Federal Rules of Civil Procedure "[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served ... Otherwise a party may amend the party's pleading only with leave of court ... and leave shall be freely given when justice so requires." FED. R. CIV. P. 15(a). When a party moves to amend the pleadings after the deadline to do so in the court's scheduling order has passed, he must satisfy the good cause requirement of FED. R. CIV. P. 16(b) before being granted leave to amend. *See Parker v. Columbia Pictures Industries*, 204 F.3d 326, 339–40 (2d Cir.2000) (citations omitted); FED. R. CIV. P. 16(b) ("A schedule *shall* not be modified except upon a showing of good cause and by leave of the district judge ...." (emphasis added)). Only if good cause is shown must "the [moving] party.... demonstrate that the amendment is proper under [the lenient standard of] Rule 15(a)." *Carnrite v. Granada Hospital Group, Inc.*, 175 F.R.D.

439, 446 (W.D.N.Y.1997) (citing *Tschantz v. McCann*, 160 F.R.D. 568, 571 (N.D.Ind. 1995)).

The reason for this is simple. Scheduling orders offer a degree of certainty in pretrial proceedings, ensuring that at some point both the parties and the pleadings will be fixed and the case will proceed. *See Parker*, 204 F.3d at 339–40. If Rule 15(a) were considered without regard to Rule 16(b), scheduling orders would be rendered meaningless and Rule 16(b) would become nugatory.

In this case, the Court directed that all pleadings be amended by March 30, 2005. Plaintiff's motion to amend was made over four months after that deadline. Pursuant to Rule 16(b), with its mandatory language—"shall not be modified" this motion must be denied unless plaintiff demonstrates good cause for not making his motion to amend before the deadline.

■ "[A] finding of good cause depends on the diligence of the moving party." *Id.* at 340 (quoting *In re Milk Products Antitrust Litigation*, 195 F.3d 430, 437 (8th Cir.1999) (internal quotations omitted)). In other words, the movant must show that the deadlines cannot be reasonably met despite its diligence. *See Robinson v. The Town of Colonie*, No. 91–CV–1355, 1993 WL 191166, at *3 (N.D.N.Y. June 3, 1993). "If [a] party was not diligent, the [good cause] inquiry should end." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992).

Plaintiff claims that having to submit a 3996 form everyday for two and one-half years constitutes an ongoing course of harassment and subjected plaintiff to constant and public ridicule from his colleagues and supervisors. This, he claims, resulted in a hostile work environment.

■ But the facts underlying his claim of hostile work environment were known to plaintiff at the time this action was filed. The alleged harassment, if any, began, and the workplace became hostile, well before the deadline for amendments in the Court's Scheduling Order. Plaintiff has not explained why the deadline set forth by the Court's Scheduling Order could not have been reasonably met. *See Rent–A–Center, Inc., v. 47 Mamaroneck Avenue Corp.*, 215 F.R.D. 100, 105 (S.D.N.Y.2003) (finding a lack of diligence because, *inter alia*, defendants did not explain why the deadline set forth in the Court's Scheduling Order could not be met). For this reason plaintiff may not belatedly amend his complaint to allege hostile work environment.

■ Plaintiff also alleges that Stengal's inspection, his report (which plaintiff insists is factually flawed) and the censure he received in July of this year constitute retaliation. These events occurred after the deadline for amendments in the Scheduling Order had passed. *See Robinson*, 1993 WL 191166, at *3 (finding good cause where the reason to seek amendment occurred after the deadline had passed.). For this reason, plaintiff's motion for leave to amend to assert a retaliation claim is not barred by the "good cause" requirement of Rule 16(b).

## B. *RULE 15(a)*

The retaliation claim must now survive scrutiny under Rule 15.

■ Leave to amend "shall be freely given when justice so requires." Fed. R.Civ.P. 15(a); *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir.1990). Notwithstanding the liberality of the general rule, "Whether to allow amendment is a decision that rests in the discretion of the district court." *H.L. Hayden Co. v. Siemens Medical Sys., Inc.*, 112 F.R.D. 417, 419 (S.D.N.Y.1986) (citations omitted). Thus, a court may deny permission to

amend, in whole or in part, if there is a proper reason to do so.

In discussing the exercise of Rule 15 discretion, the Supreme Court has stated that, in the absence of undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment, the leave sought should be given. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). "Mere delay ... absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *State Teachers Retirement Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir.1981) (citations omitted).

### 1. *Undue Delay and Prejudice*

Defendant first argues that the motion to amend should be denied because of undue delay and prejudice. Though discovery closed on July 1, 2005, the impetus of the retaliation claim did not arise until July 13, 2005, at the earliest. The motion to amend came on August 10, 2005, less than a month after the alleged retaliation occurred. This hardly qualifies as inordinate delay.

### 2. *Futility*

Defendant also argues that the motion should be denied for futility. "Where a party opposes a motion to amend a complaint based on futility, the proposed pleadings may be reviewed for adequacy." *Ricciuti v. N.Y.C. Transit Authority,* 941 F.2d 119, 123 (2d Cir.1991). The amendment will be deemed futile, and the motion to amend denied, where the "complaint would be subject to immediate dismissal." *Jones. v. New York State Division of Military and Naval Affairs,* 166 F.3d 45, 55 (2d Cir.1999).

### (a) *Subject Matter Jurisdiction*

Defendant argues that plaintiff's retaliation claim would be subject to immediate dismissal for lack of subject matter jurisdiction. Since plaintiff did not introduce the retaliation claim in his initial EEOC charge (nor could he have done so), for this court to have subject matter jurisdiction, the claim must satisfy the "reasonably related" standard of *Butts v. City of New York Department of Housing Preservation & Development,* 990 F.2d 1397, 1402–03 (2d Cir.1993).

The Second Circuit, in *Butts,* laid out three situations where claims not alleged in an EEOC charge are sufficiently related to the allegations in the charge that they are not barred. One of those is when a litigant is "alleging retaliation by an employer against an employee for filing an EEOC charge." *Id.* at 1402. Although *Butts* theory discussed retaliation only in the context of filing an administrative charge, in *Malarkey v. Texaco, Inc.,* 983 F.2d 1204, 1209 (2d Cir.1993), the Court of Appeals held that a retaliation claim could be reasonably related to an EEOC complaint even though the administrative proceedings had terminated.

Here, plaintiff claims that he was retaliated against for pursuing this lawsuit after his administrative claim was dismissed by the ALJ. He alleges that defendant began denying this long-standing requests for help with his overly-long route, and censured him for the first time for failing to complete that route in less than eight hours, after he served discovery requests and made it clear that he intended to pursue this lawsuit vigorously. These allegations satisfy the *Butts* standard for relatedness. Accordingly, the Court has subject matter jurisdiction over the proposed amendment.

**(b)** *Failure to State a Claim:*

Defendant also contends that the amended complaint does not plead a legally sufficient retaliation claim. It is wrong.

■ Dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is proper where "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir.1999). The test is not whether the plaintiff ultimately is likely to prevail, but whether he is entitled to offer evidence to support his claims. *See Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir.1998). The court assumes that all factual allegations in the complaint are true, and draws all reasonable inferences in the plaintiff's favor. *EEOC v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir.2000). "In considering a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Kramer v. Time Warner, Inc.* 937 F.2d 767, 773 (2d Cir.1991).

■ To establish a *prima facie* case of retaliation under the ADEA, plaintiff must establish that 1) the employee engaged in an activity protected by the ADEA, 2) the employer was aware of the activity; 3) an employment action adverse to the plaintiff occurred, and 4) there existed a causal connection between the protected activity and the adverse action. *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155 (2d Cir.1999). The *McDonnell Douglas* burden-shifting analysis used in claims of discrimination in violation of Title VII also applies to claims of retaliation in violation of the ADEA. *See Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir.2003) (citing, *Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir.2000)); *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir.2002).

■ Defendant argues that plaintiff did not suffer any adverse employment action. An adverse employment action is one that works a materially adverse change in the terms and conditions of employment. *Galabya v. New York City Bd. Of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). To be materially adverse, a change in working conditions must be more than merely inconvenient. Examples of adverse employment actions include termination of employment or demotion as indicated by diminution in wage, less distinguished title, material loss of benefits or wages and significantly diminished material responsibilities.

■ Viewing the facts most favorably to plaintiff, defendant's refusal to give plaintiff assistance with his route when he filed help slips subjected him to approximately five extra hours of work a week. In a forty-hour week, five additional hours—even though they are paid as overtime—represents a 20% increase in work, which could readily be deemed by a trier of fact to be a material alteration in the terms and conditions of employment. The conduct in question is more than an "inconvenience or an alteration in job responsibilities." *Galabya*, 202 F.3d at 640 (citations omitted). Moreover, the refusal to grant plaintiffs request denies plaintiff of one of the benefits of employment to which he had been accustomed for two and one-half years.

■ Plaintiff also argues that the censure that he received for failing to deliver his new route within eight hours constitutes an adverse employment action. While it is true that censure will not constitute adverse employment action absent evidence of some "tangible effect on his employment," *Brierly v. Deer Park Union*

*Free School District,* 359 F.Supp.2d 275, 299 (E.D.N.Y.2005), at the pleading amendment stage I must be guided by the Second Circuit's recently restated admonition that, "This Court has previously defined the concept of an adverse employment action broadly..." and, "....whether an undesirable employment action qualifies as being 'adverse' is a heavily fact-specific, contextual determination". *Hoyt v. Andreucci,* 433 F.3d 320 (2d Cir. 2006), citing *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir. 1997)(no bright line rules). At this point, the Court of Appeals' inclination to allow the facts to develop augurs in favor of permitting the amendment.

Accordingly, the Court grants plaintiff's motion for leave to amend to assert a claim of retaliation is granted. Plaintiff must serve the amended complaint (to the extent the court has permitted amendment) within twenty days of the date of this opinion. Defendant has ten days to serve and file an answer. I will permit sixty days thereafter—no more—for expedited discovery (if any be needed).

If the Government intends to move for summary judgment on the retaliation claim, it should do so by no later than April 30, 2006. Let me suggest that in this case, where the Government is the defendant and the court, not a jury, is the trier of fact, I may simply be inclined to let the retaliation claim go to trial. In this regard, I would note that plaintiff's assertion that Stengal's report contains misstatements of fact about what plaintiff did and did not do on his route would appear to require the taking of testimony. I also question whether I could summarily adjudicate the Service's decision to censure plaintiff for failing to complete his route on time only *after* he filed suit and *after* defendants (for whatever reason) decided that granting his daily requests for assistance would change from a routine to an irregular event. I make these statements, not because I have reached any conclusion on these issues, but to guide the Government as it decides whether or not it would be a better use of scarce taxpayer resources to forego the motion and simply to take what is left of this case to trial.

This constitutes the decision and order of the Court.